IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,016

STATE OF KANSAS,
*Appellee*,

v.

DEIZMOND C. PETERS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Where no argument or evidence is offered to show the prosecutor's reason for exercising the peremptory strikes were pretext for discrimination, a defendant fails to meet his or her burden under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

2.

Application of the invited error doctrine in the context of jury instructions turns on whether the instruction would have been given—or omitted—but for an affirmative request to the court for that outcome later challenged on appeal. The ultimate question is whether the record reflects a party's action in fact induced the court to make the claimed instructional error.

3.

A single error cannot support reversal under the cumulative-error doctrine.

1

4.

The method of determining a defendant's criminal history under the Kansas Criminal Sentencing Guidelines—which includes consideration of any prior convictions or juvenile adjudications—does not implicate a defendant's right to a jury trial under section 5 of the Kansas Constitution Bill of Rights.

5.

Clerical mistakes in judgments, orders, or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time and after such notice, if any, as the court orders.

Appeal from Sedgwick District Court; TYLER J. ROUSH, judge. Oral argument held February 2, 2024. Opinion filed September 20, 2024. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Samuel Schirer*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.: This is Deizmond C. Peters' direct appeal following his convictions for first-degree felony murder, aggravated robbery, aggravated burglary, criminal possession of a weapon, and four counts of aggravated assault. Peters raises several claims of trial and sentencing error, including (1) ineffective assistance of counsel, (2) violation of his constitutional rights during the jury selection process, (3) prosecutorial error during closing argument, (4) jury instruction error, (5) sufficiency

2

of the evidence, (6) cumulative error, (7) constitutional sentencing error, and (8) an error in the sentencing journal entry of judgment.

For the reasons stated below, we find only two of Peters' arguments have merit—the evidence does not support his conviction for possession of a weapon and the sentencing journal entry of judgment improperly omitted Peters' jail credit award. Because we find no error resulted from Peters' remaining six arguments, we affirm in part, reverse in part, and remand with directions to vacate Peters' sentence for the reversed conviction, and to issue a nunc pro tunc order correcting the sentencing journal entry of judgment.

FACTS

On the evening of February 11, 2018, teenage brothers A.B. and D.R. hung out and played video games at their Wichita home with Donte Devore and Rashidi Johnson. Devore brought a backpack with him that contained marijuana. When Devore told D.R. he planned to sell some marijuana that evening, D.R. told him not to do it inside the house.

Later that night, the group heard a knock on the window in the brothers' bedroom followed by knocking at the front door. Devore answered the door and went outside. While Devore was outside, D.R. heard a loud noise by the front door. Shortly thereafter, Devore returned to the bedroom, bleeding from the forehead. He arrived with four males who wore hoods and were armed with handguns. D.R. recognized two of the intruders as V.M. and J.S. V.M. and Devore began fighting. During the altercation, Devore was shot twice by two different guns and later died from a gunshot wound to the chest. After the shooting, the intruders fled. A.B. and D.R. implicated V.M. as the person who fired one of the shots.

3

When law enforcement arrested V.M. that same night, he was in possession of a fully loaded gun. Law enforcement quickly identified J.S., Peters, and Lascottric Yarbrough as additional suspects.

Law enforcement eventually located Peters and arrested him about a year after the murder. The State charged him with first-degree felony murder, aggravated robbery, aggravated burglary, criminal possession of a weapon, and four counts of aggravated assault.

The case proceeded to a jury trial, where V.M. testified for the State pursuant to a plea agreement. The State initially charged V.M. with first-degree murder, aggravated robbery, and criminal possession of a weapon. Under the plea agreement, V.M. pled guilty to the aggravated robbery charge, and the State dismissed the remaining charges. V.M. was not charged as an adult, and he was committed to a juvenile detention facility until his 22nd birthday. At the time of Peters' trial, V.M. was out on bond because he had completed his entire sentence.

V.M. testified he, Peters, J.S., and Yarbrough participated in the February 11, 2018, aggravated robbery resulting in Devore's death. V.M. grew up and went to school with Yarbrough and J.S. V.M. identified Peters as his brother Nakari's best friend; Nakari died in 2017. V.M. said he was friendly with Peters and called him a family friend.

V.M. provided the following testimony detailing the night of the murder. V.M. received a Facebook Messenger call from J.S. asking for help robbing "somebody you don't mess with." V.M., who had committed at least five previous drug-related armed robberies, agreed to help. Later that evening, J.S. and Peters picked up V.M. and Yarbrough from the house where V.M. lived with his grandmother and other family members. They left the house wearing hoodies and were each armed with handguns of varying calibers.

V.M. did not know where they were going. Once inside the car, J.S. said he was planning to rob Devore, who V.M. was acquainted with. After a 10-to-15-minute drive, they arrived at a house where J.S. tapped on a window. When Devore stepped onto the front porch, the men pointed their guns at him, and J.S. hit Devore in the face with his gun, causing him to bleed. V.M. reached into Devore's pockets and took a small amount of marijuana and about $100 in cash.

Wanting more drugs and money, J.S. walked Devore back into the house at gunpoint while V.M., Peters, and Yarbrough followed behind. After the intruders failed to locate more money and marijuana in the bedroom, J.S. again hit Devore in the face with his gun. V.M. pointed his gun at Devore and threatened to shoot if he did not give up his marijuana. Devore tried to tackle V.M. and take his gun. V.M. said that during the struggle, he tried to shoot Devore, but his gun did not fire. According to V.M., J.S. and Peters both shot Devore. After the shooting, the intruders fled. V.M. claimed he gave the marijuana and money he took from Devore's pockets to J.S.

V.M.'s grandmother (Grandmother) testified that on February 11, 2018, Peters and Yarbrough came to her house around 8:30 or 8:45 p.m., and V.M. left with them a few minutes later. Grandmother said Yarbrough, who she considered to be an extended family member, came inside to get V.M. while Peters waited on the porch. Grandmother knew Peters as a good friend to her grandson, Nakari, and said Peters "was always at the house." Grandmother did not see J.S.

The State also presented testimony from Taylor Kinsey, Peters' former girlfriend. At the time of Peters' trial, Kinsey was serving time for a federal conviction. Kinsey testified that after Devore's murder, she agreed to be an alibi witness for Peters and falsely told law enforcement she and Peters had been out of the state from January through March 2018, and they were in Atlanta at the time of the murder. Kinsey said she

lied for Peters because she loved him and believed he was innocent. Also during that time, Peters' mother was taking care of Kinsey's son because Kinsey was in federal custody. Kinsey later reached out to law enforcement and said she had not been with Peters when the murder occurred. Kinsey denied her story changed because her son was no longer living with Peters' mother or that she was receiving any benefit in exchange for her testimony. Kinsey claimed she had grown up and did not "want to be in that lifestyle anymore" or "have anything to do with [Peters] ever again." She admitted she had been upset with Peters and his family but said she was no longer angry with them. Kinsey said Peters was not with her when Devore was murdered. After the murder, however, she returned to Wichita to pick up Peters and they left town together.

Peters testified in his defense. Peters denied any involvement in the murder or robbery, claiming he was not in Wichita at the time because he was traveling and visiting friends while trying to build his music career and obtain a record deal. Peters admitted that other than his word, no evidence supported his alibi defense. He suggested Kinsey had changed her story because his mother no longer had custody of Kinsey's son.

Peters admitted he had created music videos featuring guns, money, and marijuana. V.M.'s deceased brother, Nakari, was in one of the videos. Peters said he had been friends with Nakari but denied he was friendly or hung out with V.M. J.S., who Peters called a family friend, was also in one of the music videos. Peters denied knowing Yarbrough.

The jury convicted Peters as charged. Peters filed a pro se motion for new trial raising various arguments, including claims his trial counsel was ineffective. Peters obtained new counsel, and the district court held an evidentiary hearing on Peters' motion. After considering the evidence and arguments from both parties, the court denied the motion, including his ineffective assistance of counsel claims.

At sentencing, the district court imposed a controlling life sentence without the possibility of parole for 618 months plus 332 months. The court awarded Peters 1,437 days of jail credit.

Peters directly appealed his convictions to this court. Jurisdiction is proper. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 22-3601); K.S.A. 22-3601(b)(3)-(4) (life sentence and off-grid crime cases permitted to be directly taken to Supreme Court); K.S.A. 21-5402(b) (first-degree murder is off-grid person felony).

ANALYSIS

Peters raises eight issues on appeal. He argues:  (1) his trial counsel was ineffective, primarily during cross-examination of V.M. and Grandmother; (2) the jury selection process violated his rights under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); (3) the prosecutor committed error by misstating evidence during closing argument; (4) the district court failed to instruct the jury on the lesser-included offense of attempted aggravated robbery; (5) the evidence does not support his conviction for criminal possession of a weapon; (6) cumulative error deprived Peters of a fair trial; (7) the district court violated his common-law right to a jury trial under section 5 of the Kansas Constitution Bill of Rights by making judicial findings of his criminal history to establish his sentence; and (8) the sentencing journal entry of judgment omits the jail credit awarded at sentencing. We address each of Peters' arguments in turn.

1.  *Ineffective assistance of trial counsel*

Peters argues the district court erred in denying his motion for new trial based on ineffective assistance of his trial counsel, Patrick Mitchell. Specifically, Peters claims he was prejudiced by Mitchell's failure to adequately impeach the testimony of V.M. and

7

Grandmother during cross-examination and Mitchell's failure to request the district court rule on an objection in front of the jury. In response, the State contends Mitchell's decisions were strategic choices supported by reasonable professional judgment and, alternatively, that Peters was not prejudiced by the alleged errors.

*Standard of review and applicable legal principles*

"The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice." K.S.A. 22-3501(1). An appellate court reviews a district court's decision on a motion for new trial for abuse of discretion. *State v. Breitenbach*, 313 Kan. 73, 97, 483 P.3d 448 (2021). A judicial decision constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *State v. Crosby*, 312 Kan. 630, 635, 479 P.3d 167 (2021).

The right to effective assistance of counsel is embodied in the Sixth Amendment to the United States Constitution and "plays a crucial role in the adversarial system." *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); see *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting *Strickland*). Courts analyze claims of ineffective assistance of counsel under the two-prong test articulated in *Strickland*. Under the first prong, the defendant must show counsel's performance was deficient. If successful, the court moves to the second prong to determine whether the defendant can establish prejudice—that there is a reasonable probability the jury would have reached a different verdict absent counsel's unprofessional errors. *Khalil-Alsalaami v. State*, 313 Kan. 472, 485-86, 486 P.3d 1216 (2021).

To establish deficient performance under the first prong, the defendant must show defense counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, reconstruct the circumstances of the challenged conduct, and evaluate the conduct from counsel's perspective at the time. 313 Kan. 472, Syl. ¶ 4.

A court considering a claim of ineffective assistance of counsel must strongly presume defense counsel's conduct fell within the wide range of reasonable professional assistance; that is, the defendant must overcome the strong presumption that, under the circumstances, counsel's action "'might be considered sound trial strategy.'" 313 Kan. at 485-86. But simply invoking the word "'strategy'" does not protect "'the performance of a criminal defendant's lawyer from constitutional criticism.'" *Sola-Morales v. State*, 300 Kan. 875, 887, 335 P.3d 1162 (2014). The appropriate question when analyzing an attorney's decisions in this area is whether the attorney's choices were objectively reasonable. *Bledsoe v. State*, 283 Kan. 81, 93-94, 150 P.3d 868 (2007).

While some aspects of a criminal case remain with the accused—such as what plea to enter, whether to waive a jury trial, or whether to testify—other aspects of a criminal case—such as what witnesses to call, whether and how to conduct cross-examination, and other strategic and tactical decisions—are left to defense counsel after consultation with his or her client. *Edgar v. State*, 294 Kan. 828, 838, 283 P.3d 152 (2012). "'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *State v. Betancourt*, 301 Kan. 282, 311, 342 P.3d 916 (2015).

Under the second prong, the defendant must show defense counsel's performance was prejudicial. To establish prejudice, the defendant must show with reasonable probability that the deficient performance affected the outcome of the proceedings, based on the totality of the evidence. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing a claim of ineffective assistance of counsel must consider the totality of the evidence before the judge or jury. *Khalil-Alsalaami*, 313 Kan. at 486.

When, as here, the district court conducts an evidentiary hearing on claims of ineffective assistance of counsel, we review the court's factual findings for substantial competent evidence. We review the court's legal conclusions based on those facts applying a de novo standard of review. See *Khalil-Alsalaami*, 313 Kan. at 486.

*Discussion*

Peters claims Mitchell's performance was deficient during cross-examination of V.M. and Grandmother, and after a bench conference when Mitchell failed to ask the district court to tell the jury it had sustained an earlier objection.

a.   *Failure to adequately impeach V.M. and Grandmother*

Peters argues Mitchell was ineffective for failing to adequately impeach V.M. and Grandmother during cross-examination by introducing evidence of their prior inconsistent statements.

> "A defendant's right to impeach a complaining witness' credibility is a fundamental right, protected by the Confrontation Clause of the Sixth Amendment: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' The primary purpose of the Confrontation Clause is to give the accused the

opportunity for cross-examination to attack the credibility of the State's witnesses." *State v. Brooks*, 297 Kan. 945, 952, 305 P.3d 634 (2013).

As with all strategy decisions, "whether and how to conduct cross-examination . . . [is] the exclusive province of the lawyer after consultation with his or her client." *Bledsoe*, 283 Kan. at 92. That said, failure by counsel to impeach the credibility of a witness whose testimony is vital to the State's case can prejudice the defendant and constitute ineffective assistance. See *Brooks*, 297 Kan. at 952-54 (holding that failure to adequately cross-examine victim on a specific issue when victim's credibility was "'all-important'" constituted ineffective assistance). But the failure to "more forcefully" press a witness is not ineffective assistance when the jury is already clearly aware of the facts underlying a particular issue. *State v. Coones*, 301 Kan. 64, 77, 339 P.3d 375 (2014). Similarly, counsel's failure to ask more specific questions related to a witness' prior inconsistent statements is not ineffective assistance when counsel discredits the witness in other ways. *Boldridge v. State*, 289 Kan. 618, 639-40, 215 P.3d 585 (2009).

i. *V.M.*

Peters claims that during V.M.'s cross-examination, Mitchell should have used V.M.'s prior statements to law enforcement and from prior court proceedings "to cement the jury's perception of him as a liar" because V.M., as the only witness placing Peters at the scene of the murder, was essential to the State's case. The district court denied Peters' claim of ineffective assistance of counsel on this basis, finding that Mitchell adequately challenged V.M.'s credibility in other ways and that additional cross-examination would not have changed the result of the trial.

In his brief challenging the district court's decision, Peters points to several inconsistent statements that Mitchell never confronted V.M. with, mainly relating to V.M.'s changing version of events and identification of his accomplices. Peters notes

11

V.M. initially did not identify him as an accomplice and later maintained he did not know Peters' name or know Peters well. Peters says this conflicted with V.M.'s trial testimony that Peters was a longtime family friend.

At the new trial hearing, Mitchell testified he planned to use an alibi defense at trial based on Peters' insistence that he was not in Wichita at the time of the murder. Mitchell's investigation of this defense was somewhat frustrated by the COVID-19 pandemic and his inability to obtain a trial continuance so he could have more time to investigate.

Mitchell testified he was aware of V.M.'s previous statements, and he used them to prepare for trial. With the alibi defense he presented, however, Mitchell did not want to emphasize V.M.'s identification of Peters. Rather than focusing on line-by-line inconsistencies with V.M.'s prior statements, Mitchell explained his strategy was to attack V.M.'s character. To that end, Mitchell focused on the plea agreement "to bring out that [V.M.] was a liar and a thug and probably the one who pulled the trigger."

During V.M.'s cross-examination, Mitchell elicited testimony that V.M. had a prior burglary conviction and had committed several previous drug-related armed robberies. Mitchell continued to mention V.M.'s criminal past throughout cross-examination. Mitchell also pointed out the favorable terms of V.M.'s plea agreement: the State dismissed the murder charge and charged V.M. as a juvenile in only one count of aggravated robbery. Mitchell explained this meant V.M. had essentially completed his entire sentence by the time of Peters' trial and would "be able to walk away" if he cooperated with the terms of the plea agreement, which included testifying against Peters. And contrary to Peters' assertion, Mitchell did question V.M. about his failure to name Peters as an accomplice during his first interview with law enforcement and got V.M. to concede his story had changed by his next interview, in part based on his understanding of the severity of the charges against him and the penalties he was facing. Mitchell also

questioned V.M. about his selective memory and asked why V.M. remembered some details clearly and others not at all.

There is no dispute that V.M.'s credibility was critical to the State's case, so undermining his credibility was therefore critical to Peters' defense. But Mitchell made a judgment call on the strategy to employ during V.M.'s cross-examination, which was within Mitchell's purview. The law does not require attorneys to exhaust every possible avenue for impeachment, as long as they engage in reasonable efforts to do so. Here, Mitchell engaged in meaningful cross-examination of V.M. that left the jury well-equipped to assess V.M.'s credibility. Mitchell vigorously challenged V.M.'s credibility using his prior convictions and bad acts and by emphasizing the benefits V.M. received by testifying against Peters. Mitchell also pointed out certain inconsistencies in V.M.'s testimony. That he could have pointed out more does not render his performance deficient. See *Boldridge*, 289 Kan. at 639-40.

Even if we were to find Mitchell's cross-examination of V.M. deficient in some respect, Peters cannot establish he was prejudiced as a result because there is no reasonable probability that any of the alleged deficiencies affected the outcome of the trial. See *Khalil-Alsalaami*, 313 Kan. at 486. As discussed, Mitchell impeached V.M.'s credibility so that pointing out additional specific inconsistencies would not have altered the course of the trial.

ii.   *Grandmother*

Peters argues Mitchell's cross-examination of Grandmother was deficient because he failed to adequately challenge her ability to identify Peters or introduce evidence of her animosity towards him. Peters contends Grandmother's credibility was key because she was the only witness besides V.M. to place him with V.M. near the scene of the

murder. Peters alleges a more thorough cross-examination could have affected the jury's assessment of Grandmother's credibility.

The district court held that while Mitchell's cross-examination of Grandmother was "a closer call," it was objectively reasonable because Grandmother was elderly, sick, and presented as a sympathetic witness. The court found Mitchell made a strategic choice not to confront Grandmother with her inconsistent statements and even if he had, it would not have resulted in a different trial outcome because Grandmother consistently testified she saw Peters at her house shortly before the murder.

As support for his claim of deficient performance, Peters first relies on Grandmother's statement during direct examination that she could "barely see" far enough to identify the color of Peters' shirt while he sat at the defense table. Peters contends this statement should have prompted Mitchell to challenge Grandmother on her ability to identify Peters on the night of the murder. Peters suggests this line of questioning would have led Grandmother to divulge her medical history and admit she had suffered a diabetic attack that night. Peters also submits Mitchell could have introduced Grandmother's prior statement to law enforcement that she had a diabetic episode just before Peters and Yarbrough arrived at her house the night of the murder.

Peters' argument is unpersuasive. Grandmother's comment about her difficulty in seeing the color of Peters' shirt from the witness stand had no bearing on her ability to identify Peters on the night of the murder. At trial, Grandmother had no issue identifying Peters, who was sitting at the table the farthest away from her. Instead, she had trouble identifying the color of his shirt from that distance. After Grandmother identified Peters' shirt as black and white, the prosecutor thanked her and commented that he had been unable to identify the color of the shirt himself. This exchange would not necessarily call into question Grandmother's testimony that she saw Peters on the front porch from the front door of her house on the night of the murder. Grandmother consistently testified she

14

recognized and knew Peters because he was her grandson Nakari's friend and he was often at her house.

Moreover, Peters' assertion that Grandmother would have admitted to having a diabetic attack compromising her vision on the night of the murder is pure speculation. Even if Grandmother did have an attack that night, it appears irrelevant. In fact, at the motion for new trial hearing, Grandmother denied the diabetic attack had anything to do with her vision; she simply needed to take her medication. And Grandmother claimed she only struggled with her vision when she drove at night.

Peters also asserts Mitchell should have introduced evidence of Grandmother's bias against Peters, including her previous statements to law enforcement that Peters was "'sneaky,'" and she did not want her grandson associating with him.

Although Mitchell did not confront Grandmother with these specific statements, he did pursue a line of questioning which suggested she might have some animosity towards Peters:

"Q: . . . [W]ere you also upset with [Peters]?
"A: No.
"Q: You didn't have any anger towards him?
"A: No.
"Q: You didn't have any ill will towards him because of a potential music deal?
"A: No.
"Q: Okay. You never—you never had any kind of conversations on Snapchat or anything about how you felt about it?
"A: No, I didn't. I don't do that. I don't Snapchat, or whatever you call it, no.
"Q: Okay. So did you sometimes talk to your granddaughters or daughters about how you felt?
"A: No. The only time I talked about how I felt in regards to [Peters] was when I was told that my grandson had got murdered, that he had—

15

. . . .

> "Q: When you say that you—are you talking about your oldest son, ma'am?
> "A: Yes, my oldest grandson.
> "Q: Okay. And so did you have any anger towards him?
> "A: No, I didn't have any anger towards him."

Mitchell's failure to go further in challenging Grandmother on her potential bias against Peters did not constitute deficient performance. See *Coones*, 301 Kan. at 77 (counsel's failure to "more forcefully" press a witness on a given point is not ineffective assistance when jury apprised of facts underlying that issue). Mitchell described Grandmother as "feeble" and testified at the motion for new trial hearing that he would not have "nailed her to the floor just because of the impression I was getting from the jury that they probably wouldn't have appreciated that." The evidentiary record and Mitchell's testimony at the motion for new trial hearing support a finding that Mitchell made a reasonable, strategic decision on how to cross-examine this sympathetic witness.

In sum, Mitchell's cross-examination of Grandmother was not deficient. But even if it was, Peters makes no persuasive argument identifying how additional cross-examination on these issues would have changed the result of the trial. See *Khalil-Alsalaami*, 313 Kan. at 486.

b. *Failure to request a ruling in the jury's presence*

To place Peters' final ineffective assistance of counsel claim in context, some additional factual background is necessary. During Kinsey's redirect examination, she testified that although she still cared for Peters, she could not forgive him. Then, the following exchange occurred with the prosecutor:

"Q: Forgive him for what?

"A: For everything that he put me through.


"Q: Your federal case—

"A: Yeah.

"Q: —did it start based on some things that [Peters] did with you?"

Mitchell objected, and counsel approached the bench, where they had an off-the-record discussion. Afterward, the district court excused the jury from the courtroom to allow for further discussion. Highly summarized, the prosecutor explained he anticipated Kinsey would testify she engaged in prostitution at Peters' request to help him post bond and hire an attorney. She was later arrested for and convicted of trafficking an underage girl to Oklahoma. The prosecutor believed this testimony was necessary to explain to the jury why Kinsey was so angry with Peters. After consulting with Kinsey's attorney, the prosecutor clarified Kinsey would not testify Peters forced her into prostitution; instead, Kinsey would say she was going to Oklahoma to get money for Peters to hire an attorney.

The district court held the State could not elicit testimony from Kinsey about prostitution or her federal trafficking conviction, whether she implicated Peters or not, because any probative value of this evidence was outweighed by the risk of undue prejudice. The jury then returned to the courtroom, and the State resumed its redirect examination of Kinsey. There was no mention of Mitchell's previous objection.

In ruling on Peters' motion for new trial, the district court made no findings about whether Mitchell's failure to request a ruling on this objection in the jury's presence constituted deficient performance. The court agreed it should have ruled on the objection but held the error was harmless because under the circumstances, it was unlikely that failing to formally rule on the objection in the jury's presence impacted the jury's verdict.

17

Even so, Peters contends Mitchell should have insisted the district court sustain his objection in front of the jury. He suggests Mitchell's failure to do so opened the door to the possibility that the jury could infer Peters had committed prior crimes and guided the jury towards a guilty verdict. But Peters' suggestion of deficient performance impacting the jury's verdict is unpersuasive and speculative. When the jury returned to the courtroom after the bench conference, the prosecutor did not reference the objection and proceeded with Kinsey's redirect examination by eliciting testimony that she had been angry with Peters and his family because she felt abandoned and had lost her son. Mitchell's failure to emphasize his previous objection was not deficient, especially since it would have reminded the jury about potentially harmful testimony against Peters. And even if it was, there is no reasonable probability the jury would have reached a different verdict if the district court had told the jury of its ruling. See *Khalil-Alsalaami*, 313 Kan. at 486.

*Conclusion*

Substantial competent evidence supports the district court's legal conclusion that Mitchell was not ineffective during cross-examination of V.M. and Grandmother or by failing to insist the court rule on his objection in the jury's presence. See *Khalil-Alsalaami*, 313 Kan. at 486. As a result, the district court did not abuse its discretion in denying Peters' motion for new trial based on ineffective assistance of counsel. See *Breitenbach*, 313 Kan. at 97.

2.  Batson

After voir dire, Peters, who is Black, unsuccessfully objected to the State's use of peremptory strikes to remove two Black members from the jury panel. Peters argues the district court erred in finding the State's reasons for striking these prospective jurors were

18

race-neutral. The State responds that Peters fails to meet his burden of proving purposeful discrimination.

*Standard of review*

An exercise of a peremptory strike from the jury panel solely based on the juror's race violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *State v. Dupree*, 304 Kan. 43, 57, 371 P.3d 862 (2016). Such exercise of the peremptory strike violates a defendant's right to a jury of his or her peers and to "purposefully exclude [minority] persons from juries undermine[s] public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87. A challenge to the State's use of a peremptory challenge during jury selection under *Batson* is analyzed in three distinct steps, with different standards of review for each step. *State v. Gonzalez-Sandoval*, 309 Kan. 113, 121, 431 P.3d 850 (2018).

The first step requires the defendant to make a prima facie showing that the prosecutor's challenge was made on the basis of race. Appellate courts exercise unlimited review over the district court's rulings on this showing. 309 Kan. at 121.

If a prima facie showing is made, the second step requires the State to produce a neutral, nondiscriminatory explanation for exercising the peremptory strike. The race-neutral explanation must be facially valid even if it is not necessarily plausible or persuasive. 309 Kan. at 123. Although the burden of production switches, the burden of persuasion never shifts from the opponent of the strike, and the reviewing court must give significant deference to the district court's factual rulings. 309 Kan. at 124. "On appeal, 'we review *de novo* whether the striking party's proffered explanation is race neutral' for purposes of satisfying the second step of the *Batson* inquiry." *United States v. Nelson*, 450 F.3d 1201, 1207 (10th Cir. 2006).

19

Once the second step is met, the burden shifts and the defendant must show the State's nondiscriminatory explanation is pretextual. At this third step, the district court assesses the plausibility of the State's race-neutral reason in light of all the evidence. *Gonzalez-Sandoval*, 309 Kan. at 126. Because plausibility is a factual matter that hinges on credibility determinations, a reviewing court should give those findings great deference. 309 Kan. at 126. Appellate courts review the decision for abuse of discretion. 309 Kan. 113, Syl. ¶ 7. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Levy*, 313 Kan. at 237.

*Additional facts*

After voir dire, the parties submitted their peremptory strikes. Peters challenged the prosecutor's use of peremptory strikes to remove from the panel two Black jurors—J.H. and R.H. Counsel argued "we can see no reason why there should have been strikes, probably one of, I believe, four potential African-American jurors on the panel. There's nothing to indicate other than she would be fair and impartial."

In response, the prosecutor provided two reasons for striking J.H. from the panel. The prosecutor said J.H. "was late coming back from the break this afternoon, which is a pet peeve of mine when people are late. I don't want them on my jury because they're going to hold up the proceedings." The prosecutor added that when asked what verdict she would return if the State failed to prove its case beyond a reasonable doubt, J.H. responded "innocent" rather than "not guilty." As a result, the prosecutor felt J.H. "was overly sympathetic to the defense and overly examining the evidence not just to go with the legal burden but with their own personal belief that it was innocence."

As for R.H., the prosecutor noted that when asked whether a defendant is guilty if he or she does not present witnesses or does not testify, R.H. responded, "Not guilty," to both questions. The prosecutor explained that although R.H. might have misunderstood the questions, he was "not willing to assume that . . . [R.H.] doesn't have a bias and doesn't have an expectation that he's going to vote not guilty no matter what."

In ruling on Peters' objection, the district court assessed the members of the jury panel and noted that of the 39 members, 6 were Black and 6 others were Hispanic, Asian, or Middle Eastern. Two of the Black panel members made the jury, three were struck by the State, and one was struck by the defense. Two of the Hispanic, Asian, or Middle Eastern panel members made the jury, and four were struck by the State. The court found these numbers were "not so lopsided as to indicate a prima faci[e] showing of race-based striking." The court then considered the reasons provided by the State for striking J.H. and R.H. and found them to be race-neutral.

*Discussion*

a. *Prima facie case by Peters*

The first step of our inquiry, over which we exercise unlimited review, is to determine whether Peters made a prima facie showing that the prosecutor's challenge was made on the basis of race. *Gonzalez-Sandoval*, 309 Kan. at 121. A defendant makes out a prima facie case of purposeful discrimination by alleging facts or any other relevant circumstances giving rise to an inference of discriminatory purpose. *Batson*, 476 U.S. at 93-94.

In support of Peters' challenge to the State's peremptory strikes removing J.H. and R.H. from the jury panel, defense counsel argued "[t]here's nothing to indicate other than she would be fair and impartial." Although we could construe the gender specific

21

pronoun "she" to mean counsel intended to exclude R.H., a male, from this argument, we decline to do so given counsel's statement immediately preceding the argument expressly states, "We're making a *Batson* challenge to No. 36, Juror 36, [J.H.], and Juror No. 18, [R.H.]."

The State argues defense counsel's objection to the State's peremptory strikes removing J.H. and R.H. from the jury panel does not establish a prima facie showing of race discrimination and, to that end, suggests the district court found Peters had failed to carry his burden at this step. We disagree with the State's characterization of the court's finding. The district court never decided whether Peters' objection—that voir dire established J.H. and R.H. could be fair and impartial—was sufficient to give rise to the inference of discriminatory purpose necessary to make a prima facie showing of race discrimination. Instead, the court found, without prompting from either party, that an objection based on a comparison of the racial makeup of the jury panel members to the number of non-White jurors who ended up on the jury would fail at step one of the *Batson* test because "[t]he numbers are not so lopsided as to indicate a prima faci[e] showing of race-based striking."

Without returning to Peters' fair and impartial argument, the district court then considered the reasons provided by the State for striking J.H. and R.H. and found them to be race-neutral. Given the court's consideration of the State's race-neutral reasons, the court's failure to make an express finding at the first step of the *Batson* test need not concern us on review. The caselaw is clear that the preliminary issue of whether the defendant made a prima facie showing under *Batson* becomes moot once the district court proceeds to the next steps. See *Hernandez v. New York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) ("Once a prosecutor has offered a race-neutral explanation . . . and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."). Thus, we move on to the second step of our analysis.

22

b. *The State's neutral, nondiscriminatory explanation*

To satisfy the second step of a *Batson* challenge, the State need only provide a specific, race-neutral reason for the use of a peremptory strike. *Gonzalez-Sandoval*, 309 Kan. at 123. The second step of the *Batson* analysis

"does not demand a prosecutor's explanation that is persuasive, or even plausible, but merely facially valid. Further, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. Accordingly, the ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike. [Citations omitted.]" *State v. Pham*, 281 Kan. 1227, 1237, 136 P.3d 919 (2006).

Here, the prosecutor provided two reasons for striking J.H. from the panel: (1) she was late returning from a break during voir dire and (2) she said she would return a verdict of "innocent" rather than "not guilty" if the State failed to prove its case beyond a reasonable doubt. The prosecutor's reason for striking R.H. from the panel was based on his response stating he would find the defendant not guilty if the defendant did not present witnesses or did not testify. Peters concedes the State offered facially race-neutral reasons for striking J.H. and R.H. from the jury.

c. *Pretext*

Once the State offered race-neutral reasons for the challenged strikes, Peters had the burden to show the reasons were pretext to conceal a discriminatory intent. *Gonzalez-Sandoval*, 309 Kan. at 126. To determine whether the race-neutral reason offered is

23

pretext, the district court must "'assess the plausibility of that reason in light of all evidence with a bearing on it.'" 309 Kan. at 126 (quoting *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S. Ct. 2317, 162 L. Ed. 2d 196 [2005]). The district court's determination in this regard is factual and often turns on the prosecutor's credibility. Thus, appellate courts are highly deferential when reviewing the district court's findings at this step. *Pham*, 281 Kan. at 1237; see *Flowers v. Mississippi*, 588 U.S. 284, 303, 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019) ("An appeals court looks at the same factors as the trial judge, but is necessarily doing so on a paper record," so review of factual determinations in a *Batson* hearing is "'highly deferential.'").

A district court may consider multiple factors in determining whether the race-neutral reason offered by the State is pretext for discriminatory intent, including statistical evidence and side-by-side comparisons of jurors. See 588 U.S. at 301-02. But the district court has no duty to consider these factors on its own initiative. *State v. Brown*, 314 Kan. 292, 303, 498 P.3d 167 (2021) (citing *State v. Campbell*, 268 Kan. 529, 535, 997 P.2d 726 [2000]). "Rather, the 'defendant has the burden to create the record of relevant facts and to prove his or her case to the trial court.'" *Brown*, 314 Kan. at 303 (citing *State v. Trotter*, 280 Kan. 800, 818-19, 127 P.3d 972 [2006]).

The evidence presented by Peters to the district court in support of pretext was identical to the evidence he presented to support his prima facie showing: "[W]e can see no reason why there should have been strikes, probably one of, I believe, four potential African-American jurors on the panel. There's nothing to indicate other than she would be fair and impartial." Peters did not challenge the State's characterization of the voir dire answers given by J.H. or R.H. or the inferences the State drew from these answers either during voir dire or at the hearing on the motion for new trial. Based on the facts and arguments presented, the district court found the race-neutral reasons provided by the State for striking J.H. and R.H. from the jury to be worthy of belief and not pretext to conceal discriminatory intent.

24

On appeal, Peters claims the district court abused its discretion in making this finding. Because he does not allege an error of law or fact, we construe his claim to allege the court's decision is so arbitrary that no reasonable jurist would agree with it. To that end, Peters argues a district court assessing the plausibility of the race-neutral reasons provided by the State for striking jurors should consider statistical evidence of the number of minority prospective jurors struck, side-by-side comparison of responses given by White members of the jury panel who the State did not strike, and the illogical or implausible nature of the prosecutor's explanation. But as noted above, Peters failed to raise any of these arguments before the district court. As a result, we do not consider them in determining whether the district court abused its discretion. See *Brown*, 314 Kan. at 304; *Gonzalez-Sandoval*, 309 Kan. at 128 (defendant's failure to raise arguments or evidence of pretext before the district court precludes appellate court from considering them for the first time on appeal).

Although Peters may have alleged facts sufficient to give rise to an inference of discriminatory intent in striking J.H. and R.H. from the jury, the prosecutor provided race-neutral reasons for those strikes, and the district court accepted those reasons as supported by the actions and statements of the jurors. Given Peters presented no further evidence of purposeful discrimination to the district court, under our deferential standard of review we hold the district court did not abuse its discretion in denying Peters' *Batson* challenge. See *Gonzalez-Sandoval*, 309 Kan. at 129 (concluding defendant failed to meet his burden under the third *Batson* step where no argument or evidence offered to demonstrate State's race-neutral reason was pretext for discrimination).

3. *Prosecutorial error*

Peters next argues the prosecutor committed reversible error by misstating the evidence during closing argument.

25

Peters did not object to the prosecutor's comments, but we review prosecutorial error claims arising out of comments made during closing argument even in the absence of a contemporaneous objection. We may, however, consider the presence or absence of an objection as part of our analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

Prosecutors have wide latitude in crafting their arguments and drawing reasonable inferences from the evidence so long as the argument is consistent with the defendant's constitutional right to a fair trial. Even so, "[a]ny argument 'must accurately reflect the evidence, accurately state the law, and cannot be "intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law."'" *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015); see also *State v. Davis*, 306 Kan. 400, 413-14, 394 P.3d 817 (2017) ("A prosecutor 'cross[es] the line by misstating the law,'" and "'a prosecutor's arguments must remain consistent with the evidence.'"). "In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation." *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019).

Appellate courts use a two-step process to analyze claims of prosecutorial error. First, we determine whether error occurred. A prosecutor commits error if the act complained of fell outside the wide latitude afforded the prosecutor to present the State's case in a manner consistent with the defendant's constitutional right to a fair trial. *State v. Thomas*, 311 Kan. 905, 910, 468 P.3d 323 (2020). Second, if we find error, we must determine whether the error prejudiced the defendant's due process rights to a fair trial, asking whether the State has shown beyond a reasonable doubt that the error did not

affect the outcome of the trial in light of the whole record—there is no reasonable possibility that the error contributed to the verdict. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

*Discussion*

Peters complains the prosecutor misstated the evidence when discussing V.M.'s testimony that he had attempted to shoot Devore, but his gun did not fire. In closing, the prosecutor pointed out V.M. did not have to admit he attempted to shoot Devore because V.M.'s admission was supported by "zero evidence from anybody else that he tried to shoot." Peters contends the prosecutor used this inaccurate and misleading statement to infer that V.M.'s testimony was credible.

To place Peters' argument in proper context, we review the relevant portion of the prosecutor's closing argument. The prosecutor talked about the physical evidence in the case and explained it supported V.M.'s testimony that Devore was attacked on the front porch. The prosecutor also noted V.M.'s description of the altercation in the bedroom— that J.S. shot Devore on his right side—was consistent with the coroner's finding that a bullet traveled through Devore's right side and went out his left side. The prosecutor then stated:

> "[V.M.] admitted to crimes he's never been charged with. Stuff that people don't know he was involved in, these other aggravated robberies. He says this is what I do. I get called on—I guess I'm the muscle. Is he a kid without a conscious? Maybe. You can decide that for yourselves. But is he a kid that can be corroborated and that you can believe.

> "I didn't shoot—I shot him. I tried to shoot but my gun didn't go off. Why did he need to say that? *There is zero evidence from anybody else that he tried to shoot.* If he's

27

making it up, if he's lying about this, why does he even have to say to you, I tried to shoot. But he did. He put himself on the line and said I tried to shoot, my gun didn't go off.

"And then remember what was found at ballistics. This gun, the one with the green tape, matches some of the bullets in the house. This gun, the Glock, that was found underneath his seat when he was arrested. I said, [V.M.], you understand we submit for ballistics, if it shows that your gun was fired. He said, nope, I didn't fire my gun. And you know what, the evidence is this gun was not fired in the house. There's no evidence that it was fired. But he admits he tried to. Well, why in the world would you admit that if you didn't have to." (Emphasis added.)

Peters asserts the evidence at trial contradicts the prosecutor's statement suggesting there was zero evidence from anybody else that V.M. tried, but failed, to shoot Devore; specifically, A.B. and D.R. initially implicated V.M. as the shooter. Peters argues the prosecutor's statement wrongly suggested that V.M. had no reason to admit that he tried to shoot Devore when, in fact, V.M.'s testimony explained the eyewitness accounts that he shot Devore.

Generally, prosecutors may not offer their personal opinions about the credibility of witnesses. Prosecutors do, however, have wide latitude to craft arguments that include reasonable inferences to be drawn from the evidence. This latitude allows prosecutors to explain to juries what they should look for in assessing witness credibility. *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 (2010). But a prosecutor errs when arguing a fact or factual inference without an evidentiary foundation. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021).

Contrary to Peters' allegation, a careful reading of the prosecutor's argument reveals that the challenged statement constituted a fair representation of the evidence. Other than V.M.'s own testimony, there was no evidence that he had tried, but failed, to

28

shoot Devore. Although A.B. and D.R. initially implicated V.M. as the shooter, they both testified at trial that they did not see who pulled the trigger. And neither A.B. nor D.R. testified they saw V.M. try, but fail, to shoot Devore. Placed in context, the prosecutor's statement provided legitimate facts the jury could consider when assessing V.M.'s credibility and was within the wide latitude allowed when discussing the evidence in closing argument. Because there was no prosecutorial error, we need not reach the prejudice prong of the prosecutorial error analysis. See *Sherman*, 305 Kan. at 109.

4. *Jury instruction*

The State charged Peters with aggravated robbery. On appeal, Peters argues the district court erred by not instructing the jury on the lesser offense of attempted aggravated robbery. Peters acknowledges he did not request this instruction below but argues the district court's failure to give the instruction resulted in clear error, requiring reversal of his aggravated robbery conviction. See K.S.A. 22-3414(3). The State counters that Peters invited any error and, in the alternative, contends an attempt instruction was not factually appropriate in this case.

When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether we can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below, i.e., whether the instruction was legally and factually appropriate; and (3) assessing whether the error requires reversal, in other words, whether the error can be considered harmless. Whether a party has preserved a jury instruction issue affects the appellate court's reversibility inquiry at the third step. *State v. Holley*, 313 Kan. 249, 253-54, 485 P.3d 614 (2021). When a defendant has failed to raise the jury instruction challenge below, we review for clear error. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). The defendant will not be entitled to reversal based on clear error unless

the appellate court is "'firmly convince[d] . . . that the giving of the instruction would have made a difference in the verdict.'" *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

a. *Step 1: preservation and invited error*

Peters concedes he did not request this instruction below. But the State alleges that beyond failing to request the instruction, Peters invited the error by specifically declining the district court's offer to instruct on any lesser offenses. While the failure to preserve an instructional error claim only affects the standard of review applied at the final step, Kansas courts will not review an instructional error claim when the invited error doctrine applies. The doctrine's application is a question of law over which an appellate court has unlimited review. *State v. Douglas*, 313 Kan. 704, 706, 490 P.3d 34 (2021).

The invited error doctrine precludes a party from asking a district court to rule a certain way and then challenging that ruling on appeal. *Douglas*, 313 Kan. at 706-07. In the context of an instructional error, the mere failure to request an instruction does not trigger invited error. But "when a defendant actively pursues what is later argued to be an error, then the doctrine most certainly applies." *State v. Sasser*, 305 Kan. 1231, 1236, 391 P.3d 698 (2017). Application of the invited error doctrine "turns on whether the instruction would have been given—or omitted—but for an affirmative request to the court for that outcome later challenged on appeal." *Douglas*, 313 Kan. at 708. "The ultimate question is whether the record reflects the defense's action *in fact induced* the court to make the claimed error." 313 Kan. at 708. To that end, we have repeatedly held defendants do not invite error by informing or confirming to the court that they are not requesting lesser offense instructions or any additional lesser offense instructions. See, e.g., *State v. Valdez*, 316 Kan. 1, 14-15, 512 P.3d 1125 (2022) (defense counsel's statement that she was only requesting one lesser offense instruction did not constitute invited error precluding review of defendant's claim on appeal that the district court

30

should have instructed the jury on another lesser offense); *Douglas*, 313 Kan. at 707-09 (defense counsel's statement that "I am not requesting any lesser included offenses" did not constitute invited error; statement did not amount to counsel "inducing" the court to act); *State v. Walker*, 304 Kan. 441, 445, 372 P.3d 1147 (2016) (no invited error when counsel merely confirmed he had not requested any lesser included offense instructions); cf. *State v. Jones*, 295 Kan. 804, 812-13, 286 P.3d 562 (2012) (invited error occurred when record showed the district court confirmed its willingness to instruct on the lesser included offense of the charged crime, but defendant objected to giving it).

At the end of the instructions conference, the following exchange occurred:

"THE COURT: All right. Are there any other instructions that either side is asking me to include?

"MR. MITCHELL: No, Your Honor.

"MR. EDWARDS [the prosecutor]: No, sir.

"THE COURT: And to be clear, I've asked you throughout the trial to consider whether either   side is asking for lesser included offenses. Is either side asking me to include lesser included offenses for any of the crimes charged?

"MR. EDWARDS: I don't believe there are any appropriate factually or legally in this case.

"MR. MITCHELL: No, Your Honor.

"THE COURT: All right. Thank you. I'm now putting the—I agree, I don't think they're factually appropriate, but for the record I just want to make sure we had that included."

Applying the doctrine here, counsel's statement affirming he was not requesting any lesser included offense instructions did not constitute invited error. Although the invited error doctrine does not preclude consideration of Peters' claim, his lack of objection to the district court's failure to give an attempted aggravated robbery instruction means he must show clear error if we reach the third step of the analysis.

31

b. *Step 2: instructional error*

At the second step, we consider the merits of Peters' claim to determine whether an error occurred. In considering the merits, we employ unlimited review of the entire record to consider whether an attempted aggravated robbery instruction would have been legally and factually appropriate. *Holley*, 313 Kan. at 254. If we find the instruction would have been legally and factually appropriate, the district court's failure to give the instruction was error. *Cooper*, 303 Kan. at 770.

"An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-5301(a). The parties agree an instruction for attempted aggravated robbery would have been legally appropriate because it is a lesser included offense of aggravated robbery. See K.S.A. 21-5109(b)(3) (a crime is a lesser included crime if it is an attempt to commit the crime charged); *State v. Plummer*, 295 Kan. 156, 160-61, 283 P.3d 202 (2012) (identifying the inclusion of jury instructions for lesser included offenses as legally appropriate).

Even if legally appropriate, however, a district court's failure to instruct on the lesser included offense is erroneous only if the instruction would have been factually appropriate. In deciding whether an instruction was factually appropriate, we must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support the instruction. *Holley*, 313 Kan. at 255.

Peters argues an attempt instruction would have been factually appropriate in this case because V.M.'s testimony was the only evidence suggesting that an aggravated robbery was ever completed. Although the trial evidence established the four intruders intended to rob Devore, Peters claims no evidence corroborated V.M.'s testimony that he stole money and marijuana from Devore on the porch. Because law enforcement

32

discovered significant amounts of marijuana in the bedroom in the house where the robbery occurred, Peters alleges the jury could have inferred that the intruders tried, but failed, to commit a robbery. Given V.M.'s credibility issues, Peters contends the jury should have had the option to convict on attempted aggravated robbery.

The State responds an attempted aggravated robbery instruction was not factually appropriate because V.M.'s testimony is evidence that an aggravated robbery occurred, even if the intruders failed to take anything from inside the house.

Peters' argument essentially asks this court to reweigh the evidence relied upon by the jury and make a credibility determination in his favor, which we cannot do. See *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021) (appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses). There is simply no evidence to demonstrate that a jury instruction for attempted aggravated robbery was supported by the facts of the case. No evidence refutes V.M.'s testimony that an aggravated robbery occurred on the front porch. The only people on the porch were the four intruders and Devore; besides Peters, V.M. was the only one who testified about the alleged robbery on the porch. And Peters' argument disregards other pieces of circumstantial evidence that corroborate V.M.'s testimony. D.R. testified he told Devore not to conduct his drug deal inside the house. Thus, it is logical to infer that when Devore went outside, he would have had with him whatever amount of marijuana and cash were necessary for the drug deal. There was no evidence that Devore was found with any money or drugs on his person. Additionally, there was evidence of blood on the front porch, and Devore was bleeding from his head when he came back inside the house. This evidence aligns with V.M.'s claim that Devore was attacked and robbed on the porch. Finally, evidence of marijuana found inside the house does not factually support a jury instruction for attempted aggravated robbery because it is irrelevant to whether an aggravated robbery occurred on the porch.

33

Because a jury instruction for attempted aggravated robbery was not factually appropriate, the district court did not err in failing to include the instruction. As a result, there is no error for this court to analyze in step three.

5. *Sufficiency of the evidence*

Peters argues the evidence presented at trial does not support his conviction for criminal possession of a weapon due to an error in the stipulation the State relied on to prove this charge. The State concedes the evidence was insufficient to support Peters' conviction and that it must be reversed on this basis.

"'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *Aguirre*, 313 Kan. at 209.

In Count 8 of the complaint, the State charged Peters with criminal possession of a weapon under K.S.A. 2017 Supp. 21-6304(a)(2). This statute provides that a person criminally possesses a weapon when:

"within the preceding five years [the person] has been convicted of a felony, other than those specified in subsection (a)(3)(A), under the laws of Kansas or a crime under a law of another jurisdiction which is substantially the same as such felony, has been released from imprisonment for a felony or was adjudicated as a juvenile offender because of the commission of an act which if done by an adult would constitute the commission of a felony, and was not found to have been in possession of a firearm at the time of the commission of the crime." K.S.A. 2017 Supp. 21-6304(a)(2).

34

At trial, the parties entered into a written stipulation relating to this charge. But neither the parties nor the district court recognized that the stipulation erroneously said Peters' prior adjudication was for a felony offense listed in K.S.A. 2017 Supp. 21-6304(a)(3)(A), rather than for a felony "other than those specified in subsection (a)(3)(A)." See K.S.A. 2017 Supp. 21-6304(a)(2). The stipulation provided:

"1.  On April 28, 2015, defendant Deizmond Peters was adjudicated a juvenile offender for a felony offense listed in K.S.A. 21-6304(a)(3)(A).

"2.  The defendant was not found to be in possession of a firearm at the time of the prior crime and has not had the prior adjudication expunged or been pardoned for such crime.

"3.  It is the parties' agreement that this stipulation satisfies elements 2 and 3 of the instruction on count 8, criminal possession of a weapon by a convicted felon."

The district court admitted the stipulation into evidence, and the court later instructed the jury on the elements of criminal possession of a weapon by using the same erroneous language in the stipulation.

The stipulation was the only evidence before the jury on the criminal possession of a weapon charge, and it stated Peters had a prior felony adjudication for an offense listed in K.S.A. 2017 Supp. 21-6304(a)(3)(A). But Peters' previous felony adjudication was for attempted burglary, which is not an offense listed in K.S.A. 2017 Supp. 21-6304(a)(3)(A). Given the error in the stipulation, the evidence does not support Peters' conviction for criminal possession of a weapon. As a result, Peters' conviction must be reversed.

6.  *Cumulative error*

Peters argues the cumulative effect of the alleged errors requires reversal of his convictions. Because we have identified only one error—insufficient evidence to support

35

his criminal possession of a weapon conviction—there is no error to accumulate and therefore no basis to reverse Peters' remaining convictions. See *State v. Ballou*, 310 Kan. 591, 617, 448 P.3d 479 (2019) (single error cannot support reversal under cumulative error doctrine).

7. *Constitutional right to a jury trial*

Next, Peters argues the district court violated his jury trial rights under section 5 of the Kansas Constitution Bill of Rights when it considered his 2015 juvenile adjudication to determine his criminal history score for sentencing. He contends the Kansas Sentencing Guidelines Act (KSGA) violates section 5 of the Kansas Constitution Bill of Rights because it permits judicial fact-finding of prior adjudications without first requiring the State to prove those adjudications to a jury beyond a reasonable doubt. In response, the State argues Peters did not preserve this claim for appellate review and that it otherwise lacks merit.

A constitutional challenge to the KSGA involves a question of law subject to unlimited review. *State v. Wetrich*, 307 Kan. 552, 555, 412 P.3d 984 (2018).

*Discussion*

The parties dispute whether Peters preserved this issue for appellate review. While the record reflects Peters did challenge his criminal history below, he did not make the specific argument he now alleges on appeal.

A presentence investigation report found Peters had a criminal history score of B, based in part on a prior felony conviction for fleeing and eluding and a juvenile adjudication for attempted burglary. Before sentencing, Peters challenged his criminal history score as erroneous and unconstitutional under *Alleyne v. United States*, 570 U.S.

99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). He argued his juvenile adjudication did not fall under any "prior conviction" exception and thus must be submitted to a jury and proven beyond a reasonable doubt. Peters' argument did not mention his jury trial rights under section 5 of the Kansas Constitution Bill of Rights.

Typically, constitutional issues cannot be raised for the first time on appeal. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). Exceptions to this general rule exist, including when the issue involves only questions of law and is finally determinative of the case or when consideration of the issue is necessary to serve the ends of justice or prevent a denial of fundamental rights. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). Peters alleges both exceptions apply to warrant review of his arguments.

The decision to address an unpreserved issue for the first time on appeal is a prudential one, even when one of the exceptions is satisfied. *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020). Neither exception appears applicable here. First, resolution of Peters' constitutional challenge is not finally determinative of the case because if he is correct, then the case would merely return to the district court for resentencing. Second, Peters' fundamental rights are not at risk because this court rejected a similar argument in *State v. Albano*, 313 Kan. 638, 487 P.3d 750 (2021). In *Albano*, we addressed whether the use of a defendant's criminal history—without a finding by a jury—to increase the defendant's sentence violated section 5 of the Kansas Constitution Bill of Rights. After examining Kansas common law, we noted that, in Kansas, juries have traditionally determined guilt, and the role of the court is to determine punishment and issues relevant to it, including a defendant's criminal history. 313 Kan. at 646-51. Finding no authority to support the contention that Kansas had adopted a common-law rule inconsistent with this traditional division of functions when the Kansas Constitution was adopted in 1859, we held that "[s]ection 5 of the Kansas Constitution Bill of Rights does not guarantee

defendants the right to have a jury determine the existence of sentence-enhancing prior convictions under the revised Kansas Sentencing Guidelines Act." 313 Kan. 638, Syl. ¶ 4.

Peters acknowledges our holding in *Albano*, but suggests it is distinguishable because his case involves a juvenile adjudication. He asserts that because juvenile adjudications did not exist before the 20th century, there was no established common-law practice of using prior juvenile adjudication findings to increase the permissible range of a criminal defendant's sentence in 1859.

But Peters' argument ignores the fact that *Albano* is premised on our finding that the traditional function of the court is to determine punishment and to make findings relevant to punishment, including a defendant's criminal history. We held that "such judicial findings do not impair the traditional functions of the jury in Kansas criminal proceedings." 313 Kan. at 657. Imposing legally appropriate punishment includes making findings related to a defendant's criminal history. See 313 Kan. at 650 ("Kansas has never recognized a general rule that sentence-enhancing prior convictions must be proven to a jury."). These findings also necessarily include consideration of a defendant's prior juvenile adjudications and thus do not impair the traditional functions of the criminal jury in Kansas. See *State v. Fischer*, 288 Kan. 470, 472-75, 203 P.3d 1269 (2009) (juvenile adjudications in Kansas after June 20, 2008, are akin to adult prosecutions because juveniles adjudicated after that date have a right to a jury trial); *State v. Hitt*, 273 Kan. 224, 235-36, 42 P.3d 732 (2002) (use of juvenile adjudications in calculating criminal history does not violate a defendant's constitutional rights under *Apprendi*).

Criminal history findings made to calculate a sentence fall within the exclusive purview of the court to determine punishment. Thus, the KSGA's method of determining a defendant's criminal history—which includes consideration of any prior convictions or juvenile adjudications—does not implicate a defendant's right to a jury trial under section

5 of the Kansas Constitution Bill of Rights. See *Albano*, 313 Kan. at 656-57. Peters' constitutional challenge necessarily fails under *Albano*.

8.   *Jail credit*

At sentencing, the district court and the parties agreed Peters was entitled to 1,437 days of jail credit. But the sentencing journal entry of judgment omitted the jail credit award, and the parties recognize the sentencing journal of judgment must be corrected to include it.

This discrepancy in the journal entry is a simple clerical error which can be addressed by a nunc pro tunc order correcting the portion of the journal entry to include Peters' jail credit award. See K.S.A. 22-3504(b) ("Clerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time and after such notice, if any, as the court orders.").

Judgment of the district court is affirmed in part, reversed in part, and the case is remanded with directions to vacate Peters' sentence for criminal possession of a weapon, to resentence him without the reversed conviction, and to issue a nunc pro tunc order correcting the sentencing journal entry of judgment to include 1,437 days of jail credit.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.