NOT DESIGNATED FOR PUBLICATION

No. 126,372

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

MARK A. KOCH,
*Appellant.*

MEMORANDUM OPINION

Appeal from Riley District Court; KENDRA S. LEWISON, judge. Oral argument held January 6, 2026. Opinion filed February 27, 2026. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant, and *Mark A. Koch*, appellant pro se.

*David Lowden*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before SCHROEDER, P.J., MALONE and GARDNER, JJ.

PER CURIAM: Following an incident where Mark A. Koch broke into a house and brutally attacked its resident, he was convicted of aggravated kidnapping, attempted second-degree murder, aggravated burglary, aggravated battery, burglary, and theft. Koch appeals his convictions and sentence on numerous grounds. After thoroughly reviewing the record, we find no reversible error and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On October 10, 2019, N.A. was home alone with her dog. At about 11 p.m., N.A. was in bed when her dog started barking at the bedroom door. She got up, turned on the bedside lamp, opened the bedroom door, and started walking toward the living room when suddenly a screaming man came running toward her from the spare bedroom.

The man, later identified as Koch, grabbed N.A. and shook her, pushing her back into her bedroom and toward her closet. As Koch was trying to force N.A. into the closet he punched her in the face, breaking her nose. N.A. tried to lunge for her phone, which was on the bedside table across the room, but Koch had ahold of her and managed to get to the phone and toss it away before she could reach it. At that point, Koch started trying to wrap an electrical cord around N.A.'s neck to strangle her, but she managed to get her arm between the cord and her neck. As Koch continued to try to strangle her, N.A. believed he intended to kill her. When Koch could not tighten the cord because N.A.'s hand was in the way, he grabbed a glass jug and repeatedly hit her with it.

At some point during the struggle, N.A. realized she might be in a fight for her life and bit Koch's forearm and wrestled the jug away from him. After spitting out a chunk of Koch's hairy arm, N.A. started fighting back, using the jug as a weapon. The pair continued to exchange blows until N.A. smashed the jug on Koch's head. Koch then stopped his attack, got up, and tried to get out of the bedroom. Koch turned around to look at N.A., and she pleaded with him, "'It's okay. I'm just gonna open the door for you.'" She opened the door and Koch fled from the bedroom and out the front door.

After she watched Koch leave, N.A. locked the front door behind him, found her cellphone, and called 911. She stayed on the line with the dispatcher until Officer Jake Shailer of the Riley County Police Department arrived. Around this time, N.A.'s boyfriend called her after noticing her talking to Shailer on a security camera they had set

2

up for their dog. Shailer called for an ambulance and asked N.A. to tell him what had happened. Shailer also spoke with N.A.'s boyfriend on her phone. Paramedics soon arrived and took N.A. to a hospital in Manhattan.

At the emergency room, N.A. explained to the doctor and nurses the details of the attack, explaining that she had been repeatedly hit in the face with fists and a glass jug, been bitten, and strangled with an electrical cord. N.A. told the doctor that she was lucky she never lost consciousness and thought the intruder was going to kill her. Shailer interviewed N.A. again after she was admitted to the hospital—their conversation was recorded on Shailer's Axon. N.A. explained the entire ordeal, including about Koch trying to wrap the electrical cord around her neck during the attack. Detective Janelle Compagnone conducted another, more detailed interview with N.A., during which N.A. indicated that she was certain that Koch was trying to kill her. Shailer left the hospital to join another officer who had followed a trail of blood leading from N.A.'s house to an apartment building a block down the street, later determined to be Koch's residence.

Shailer and other officers entered the building, a split level building with several apartments, and first spoke with Koch's downstairs neighbor, who told the officers that he had reported a break-in at his apartment earlier that evening. The officers followed the blood trail up the stairs to Koch's apartment, where they spoke to Cynthia Arganbright, Koch's ex-mother-in-law, who lived in the apartment with Koch. While Arganbright initially hesitated to let the officers inside, she relented when they mentioned the blood leading to the apartment. Although the officers found additional blood around the apartment, they did not find Koch. The officers later obtained a search warrant for the apartment and discovered items stolen from the downstairs neighbor.

Koch initially fled to the house of his drug dealer, then skipped town to his brother's house near St. Louis. Koch called his brother asking for help, but his brother

3

contacted the police and alerted them to Koch's plan. A warrant was issued for Koch's arrest and he was picked up four days later in Missouri.

On October 11, 2019, the State initially charged Koch with aggravated kidnapping, aggravated burglary, aggravated battery, residential burglary, and two counts of theft. But on November 19, 2019, the State filed an amended complaint adding a charge of attempted murder in the second degree.

The case proceeded to trial in August 2022. Following the State's presentation of its case-in-chief, Koch testified on his own behalf. He began by conceding that he had committed the charged crimes of simple residential burglary and theft relating to his neighbor's downstairs apartment. Koch explained that his motivation to commit these crimes was to support his drug habit. Koch testified that he was addicted to methamphetamine and had been using it repeatedly on the day he broke into N.A.'s residence.

Koch recalled that on the night of October 10, 2019, after either shooting or smoking methamphetamine, he left his house to buy cigarettes, when he noticed N.A.'s house was completely dark and had a keyless lock on the door. Koch knew such locks frequently malfunction and are often left unlocked. Koch discovered the door was unlocked, so he entered to look for items to steal. While moving through the house, Koch ran into N.A. and "really freaked out." Koch recalled that he began pushing N.A. and punching her: "[W]e were both moving and pushing and reacting to each other so, I mean, I'm not gonna say she was attacking me, but she was definitely defending herself." While Koch admitted to repeatedly hitting N.A. and biting her, he testified that at no point was he trying to push or confine her to any location and never gained control over her. He claimed that he never tried to strangle N.A., speculating that the electrical cord was simply tangled around them during the struggle. Koch denied having any intent to

4

kill or kidnap anyone and stated that he had believed N.A.'s home was empty when he entered. Koch thought the entire ordeal happened very fast and lasted about one minute. After N.A. bashed him with the glass jug, Koch decided it was time to flee the scene. He confirmed that N.A. had to help him open the door. At that point, he ran back to his house, where he later escaped via a window to the roof when the police arrived.

During the instructions conference, Koch asked the district court to provide several instructions, including an instruction on the nature of confinement necessary for kidnapping, a lesser included crime of attempted aggravated kidnapping, and a unanimity instruction as to the alleged overt acts of the attempted second-degree murder. Koch also requested that the State choose the specific alternative means of aggravated burglary, or in the alternative give the jury another unanimity instruction on that charge. The district court denied all of these requests. After listening to the parties' closing arguments and deliberating, the jury found Koch guilty of aggravated kidnapping, attempted second-degree murder, aggravated burglary, aggravated battery, burglary, and theft.

Before sentencing, Koch moved to represent himself, which the district court granted. He also moved for a new trial, raising many claims, including issues his counsel had raised at trial. He objected to his criminal history score, arguing in part that he was not represented by counsel for a prior conviction for municipal misdemeanor battery.

At sentencing, Koch again challenged the inclusion of the municipal misdemeanor in his criminal history score, but the district court denied the objection and, upon aggregating that conviction along with two others as a person felony, found Koch's criminal history score to be a C. The district court imposed a controlling sentence of 284 months' imprisonment with 36 months' postrelease supervision. Koch timely appealed his convictions and sentence. Additional facts will be provided to address the issues.

5

ANALYSIS

*Was Koch denied his right to present a defense and cross-examine the witnesses?*

Koch asserts the district court denied him his right to present a defense and impermissibly restricted his constitutional right to cross-examination when it limited the scope of his cross-examination of N.A. and the investigating detective. Koch argues the district court should have permitted questions about discussions N.A. had about the case with an out-of-state prosecutor and whether her recollections about the incident changed as a result of those discussions. The State maintains the district court reasonably placed limitations on Koch's cross-examination regarding its charging decisions in the case.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Implicit in this right of confrontation is a defendant's right of cross-examination. *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). But this right is not absolute, and at times it must "'bow to accommodate other legitimate interests in the criminal trial process.'" *State v. Thomas*, 307 Kan. 733, 738, 415 P.3d 430 (2018). The United States Supreme Court has explained that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). In other words, "'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" 475 U.S. at 679.

"Because a district court may exercise reasonable control over the scope of cross-examination, appellate courts review the court's decision to limit cross-examination for

6

an abuse of discretion." *Thomas*, 307 Kan. at 739. "And to the extent this issue also involves the district court's decision to limit cross-examination based on evidentiary rulings, those rulings are also reviewed for an abuse of discretion." *State v. Frantz*, 316 Kan. 708, 721, 521 P.3d 1113 (2022). An abuse of discretion occurs "'when (1) no reasonable person would have taken the view adopted by the district court; (2) the judicial action is based on an error of law; or (3) the judicial action is based on an error of fact.'" 316 Kan. at 721. As the party alleging error, Koch has the burden to prove the district court abused its discretion. *Thomas*, 307 Kan. at 739.

The crux of Koch's argument is that N.A. allegedly changed her story about the incident, becoming more certain of Koch's intent to try to kill her over the course of several interviews with Compagnone. Koch contends that N.A. changed her account of the ordeal after speaking to a friend who is a prosecutor in another state. He argues he should have been permitted to present three pieces of information along these lines: (1) N.A.'s prosecutor friend told her boyfriend that the act of wrapping a cord around her neck could support an attempted murder charge; (2) N.A.'s boyfriend indicated to Compagnone that they wanted the State to pursue the most serious charge possible; and (3) Compagnone told N.A. that the State had not initially charged attempted murder because she had not expressed any certainty about Koch trying to kill her. Koch contends that this evidence showed that "[N.A.] went from being unsure she was being strangled on the day of the struggle to certain Mr. Koch was trying to kill her" during an interview with Compagnone four days later.

While cross-examining N.A., Koch's counsel asked whether she had spoken with Compagnone about the State charging Koch with attempted murder. The State objected, arguing that such questions and Compagnone's statements about charging decisions were irrelevant and inappropriate. Koch's counsel countered that the questioning was relevant because N.A. had allegedly made inconsistent statements about the incident during her

7

two interviews with Compagnone. The district court ruled that counsel could ask N.A. questions about alleged inconsistencies in her story and statements about her level of certainty but could not delve into conversations about charging or comments made by an out-of-state prosecutor about attempted murder. But other than limiting testimony about the charging decisions, the district court did not limit counsel's cross-examination, and the State did not object further during Koch's cross-examination.

Later, during Koch's cross-examination of Compagnone, the issue came up again. Compagnone had first interviewed N.A. at the hospital several hours after the incident. Compagnone recalled that N.A. told her at that time that Koch had tried to strangle her; her story remained consistent on this point at her subsequent interview. When Koch's counsel attempted to ask Compagnone about N.A.'s boyfriend's comments about a prosecutor friend during the second interview, the State objected. Again, Koch's counsel argued that N.A.'s testimony had been inconsistent and that he wanted to present evidence to show that she had changed her story to try to get the State to charge attempted murder. The district court pointed out that Koch was never prevented from highlighting alleged inconsistencies in N.A.'s testimony, its only restriction was about charging decisions made in the case. The district court questioned why N.A.'s boyfriend's comment about wanting the highest possible charges or about their conversation with a prosecutor friend was relevant. The district court also questioned how these pieces of evidence could constitute impeachment evidence of Compagnone.

The district court allowed Koch's counsel to proffer testimony from Compagnone outside the jury's presence without limitation concerning N.A.'s statements about her belief that Koch was trying to kill her and her certainty in that belief. According to Compagnone, she reinterviewed N.A. four days after the incident; N.A.'s boyfriend and mother were also present at the second interview. N.A.'s boyfriend told Compagnone that a friend who was a prosecutor had told them that Koch's actions, specifically, the

8

strangulation, would support a charge for attempted murder. Compagnone recalled that she talked through the elements of various offenses, and N.A. expressed that she was absolutely certain that Koch was trying to kill her. She said, "'There's no doubt in my mind that he was like trying to kill me like a hundred percent.'" Compagnone indicated to N.A. that the prosecution would make the decisions about the charges to file, and N.A.'s boyfriend responded, "'We want to do everything we can to make sure we get the most serious charges.'" Compagnone thought N.A.'s recollections of the events remained consistent throughout the interviews—that is, she always expressed a belief that Koch was trying to kill her when he strangled her.

Returning to the information that Koch alleges was erroneously excluded, he claims the district court "erred in denying the information as irrelevant." In his reply brief, Koch argues that the district court's ruling violated his constitutional right to cross-examination and is thus not subject to harmless error analysis. The State counters that the district court did not abuse its discretion by limiting Koch from presenting these matters in his cross-examination because they were not relevant "due to it concerning a prosecutor's discretionary, decision-making process."

"'Relevant evidence'" is any evidence "having any tendency in reason to prove any material fact." K.S.A. 60-401(b). To be relevant, evidence must be material and probative. Evidence is material when the fact it supports is in dispute or at issue in the case. Evidence is probative if it tends to prove a material fact. *State v. Miller*, 308 Kan. 1119, 1167, 427 P.3d 907 (2018). But "[e]ven if evidence is relevant, a trial court has discretion under K.S.A. 60-445 to exclude such evidence where the court finds its probative value is substantially outweighed by its potential for producing undue prejudice." *Miller*, 308 Kan. at 1167.

9

Koch contends that the evidence about conversations N.A. and her boyfriend had with their prosecutor friend was relevant in two ways. First, because "whether Mr. Koch attempted to kill [N.A.] is in dispute." Second, because it showed that N.A. was biased against him. In his own words: "The proffered purpose of introducing these three pieces of information, was to show how [N.A.] went from being unsure she was being strangled on the day of the struggle to certain Mr. Koch was trying to kill her on October 15, 2019." None of these grounds rendered the evidence relevant.

The premise of the relevance of the excluded information was that N.A.'s statements about the incident had somehow changed, but that was not the evidence presented to the jury. According to various witnesses during the trial, N.A. had consistently stated her belief that Koch was trying to strangle her—she said so when speaking to Shailer, medical staff at the hospital, and Compagnone. N.A. expressed this belief before she and her boyfriend allegedly spoke to their prosecutor friend. The district court placed reasonable restrictions on Koch's cross-examination of the witnesses. The district court allowed defense counsel to cross-examine N.A. and Compagnone about any alleged inconsistencies in N.A.'s statements but did not let him ask questions about charging decisions. The district court's ruling was not an abuse of discretion and did not infringe on Koch's constitutional right to cross-examine witnesses.

*Did the State present sufficient evidence to convict Koch of aggravated kidnapping?*

Koch next argues that the State did not present sufficient evidence to support his conviction for aggravated kidnapping because it did not demonstrate that he confined N.A. nor that he had the requisite specific intent to inflict bodily injury or terrorize her. The State responds that it presented sufficient evidence to support the confinement and the specific intent elements of the aggravated kidnapping offense.

An appellate court reviewing whether the State presented sufficient evidence to sustain a conviction looks at all the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In doing so, this court will not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Harris*, 310 Kan. 1026, 1030, 453 P.3d 1172 (2019).

To secure a conviction on the aggravated kidnapping charge, the State was required to prove that Koch (1) forcibly confined N.A. (2) with intent to hold her (3) to inflict bodily injury or terrorize her and (4) that bodily harm was inflicted on N.A. See K.S.A. 21-5408(a)(3), (b). Koch focuses his argument on two elements, asserting the State presented no evidence (1) that he actually confined N.A. and (2) that he had the specific intent to hold N.A. to inflict bodily harm or terrorize her.

Koch's assertion that there was "no evidence of actual confinement of [N.A.]" is contradicted by N.A.'s testimony about the attack. Koch concedes that there was ample evidence that he inflicted violence upon N.A. but maintains that he never had sufficient control over her during the struggle and only incidentally ended up in the bedroom. N.A. testified that when she walked toward her living room, a screaming Koch charged her, grabbing her and forcing her back into her bedroom. She explained that Koch was "kind of like pushing, shoving [her] into [her] bedroom and . . . he was trying to like shove me into the closet. The closet had like the sliding doors. He was shoving me into it."

N.A. also explained that Koch was physically constraining her from moving and escaping him. She recalled that he began punching her in the face as he tried to shut her in the closet. As she tried to get away and grab her phone, Koch got on top of her and continued to hit her and then wrapped the electrical cord around her neck. Koch then continued to beat N.A. with his fists and the glass jug. Throughout the attack, N.A.

11

thought that Koch was going to kill her and that killing him first was the only way she could escape. This evidence provides a sufficient basis for the jury to find that Koch seized and restrained N.A.; that is, he unlawfully restricted her freedom during the ordeal. When viewed in a light most favorable to the State, there was sufficient evidence to support that Koch confined N.A. in her bedroom.

Next, Koch contends that even if there was evidence to show that he confined N.A., the State failed to prove that he acted with the specific intent to inflict bodily injury on her. Again, Koch's argument is contradicted by N.A.'s testimony. It is undisputed that N.A. suffered serious injuries, including a broken nose, lacerations and bruises all over her face, and ligature marks and bruises on her neck, as a result of Koch's attack. Koch asserts that because he did not make any comments that he wanted to hurt N.A. and did not use any restraints to confine her, there was no evidence that he intended to injure her. But as has been long observed, "circumstantial evidence may sustain even the most serious convictions and . . . may be used to show intent." *State v. Thach*, 305 Kan. 73, 84, 378 P.3d 522 (2016). The evidence of Koch's sustained and varied attack on N.A.—the prolonged punching, strangling, and beating with the glass jug—supports the conclusion that Koch's conscious objective was to injure and/or terrorize her. Because the State presented sufficient evidence to support the elements of confinement and the intent to inflict bodily injury or terrorize N.A., Koch's sufficiency of the evidence argument fails.

*In the alternative, must Koch be resentenced under K.S.A. 21-5109(d)?*

Next Koch argues that his sentence is illegal under K.S.A. 21-5109(d) because he is being punished for three crimes that arose from the same conduct under three statutes of varying specificity. He argues his convictions for aggravated kidnapping, attempted second-degree murder, and aggravated battery all arose from his infliction of bodily injury on N.A. and his sentence should have been based only on the most specific crime. The State responds that Koch did not raise this claim in district court so the issue is not

12

preserved for appeal. On the merits, the State asserts K.S.A. 21-5109(d) does not apply because the three convictions are not more specific versions of the same conduct.

Koch did not present this claim to the district court. But because he is claiming his sentence is illegal, which he can do any time he is serving the sentence, we will address the merits of his claim. See K.S.A. 22-3504 (court may review illegal sentence any time defendant is serving the sentence, and illegal sentence includes sentence that does not comport with applicable statute). Whether a sentence is illegal is a question of law subject to unlimited review. *State v. Daniels*, 319 Kan. 340, 342, 554 P.3d 629 (2024).

When a defendant's conduct violates more than one criminal statute, K.S.A. 21-5109(a) permits the State to charge and convict the defendant of multiple crimes. But the statute places limits on that discretion. Koch advances his claim under one of those limitations, set out in subsection (d):

"(d) Unless otherwise provided by law, when crimes differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct, the defendant:
(1) May not be convicted of the two crimes based upon the same conduct; and
(2) shall be sentenced according to the terms of the more specific crime." K.S.A. 21-5109(d).

K.S.A. 21-5109(d) was enacted in 2010 and was meant to codify the "general [versus] specific offense doctrine" present in Kansas caselaw. See *State v. Ruiz*, 317 Kan. 669, 681, 538 P.3d 828 (2023). The subsection (d) limitation applies "when crimes differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct." K.S.A. 21-5109(d). The Kansas Supreme Court has held that this language indicates that "a statute describes a crime that

13

is more specific than another only if it prohibits identical conduct plus an additional, specifying element." *State v. Johnson*, 321 Kan. 357, 373, 580 P.3d 20 (2025).

Cases that have applied K.S.A. 21-5109(d) bolster the conclusion that a crime is not a more specific version than another if the two offenses prohibit different conduct. In *State v. Alston*, 318 Kan. 979, 988, 551 P.3d 116 (2024), the Kansas Supreme Court concluded that K.S.A. 21-5109(d) is inapplicable to first-degree murder under an aiding and abetting theory and conspiracy to commit first-degree murder because they consist of a "different concept." The *Alston* court explained "[n]either [offense] is more general nor more specific than the other because *each targets a different theory of liability*." (Emphasis added.) 318 Kan. at 988; see also *State v. Stohs*, 63 Kan. App. 2d 500, 506, 531 P.3d 533 (2023) (interference with a law enforcement officer not more specific crime than felony identity theft because "identity theft prohibits different conduct" from interference with a law enforcement officer).

The question for this court is whether the statutes proscribing the crimes of aggravated kidnapping, attempted second-degree murder, and aggravated battery all seek to prohibit the same conduct to varying degrees of specificity—if not, then K.S.A. 21-5109(d) is inapplicable. Koch does not identify which of the three offenses is the most specific. Instead, he suggests this court should remand to "the district court for determination of the most specific conviction covering his conduct."

Koch argues that because the same underlying conduct—his infliction of bodily injury on N.A.—resulted in all three convictions, K.S.A. 21-5109(d)(2) requires that he be sentenced only for one of the convictions. Koch attempts to distinguish the reasoning in *Alston* because that case involved a distinction between a charge based on a theory of aiding and abetting and a charge based on a conspiracy, whereas in this case, "the precise theory of kidnapping was based upon conduct wholly subsumed and unitary within other

14

offenses for which Mr. Koch was also convicted." This argument obscures the question at hand. While there is some overlap in the particular conduct the charges were based on, aggravated kidnapping, attempted second-degree murder, and aggravated battery do not "differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct." See K.S.A. 21-5109(d).

The elements of these offenses each required the State to prove different facts to establish each offense. The aggravated kidnapping charge required proof that Koch confined N.A. by force with intent to hold her to inflict bodily injury and that bodily harm was inflicted upon her. The attempted second-degree murder charge required proof that he performed an overt act toward the commission of an intentional murder in the second degree and did so with intent to commit murder but failed to complete the murder. The aggravated battery charge required proof that Koch knowingly caused great bodily harm or disfigurement to N.A. Although all three of the charges encompassed the same base of Koch's conduct—the violent actions that constituted a confinement of N.A.—the statutes criminalize different actions. Each crime criminalizes a different act, they are not the same, either generally or specifically. They do not prohibit the same conduct with varying degrees of specificity. Thus, aggravated kidnapping, attempted second-degree murder, and aggravated battery are not crimes that come within the scope of K.S.A. 21-5109(d). As a result, Koch's sentence for the three crimes is not illegal.

*Did the district court err by refusing to give an instruction with the language of the* Buggs *test for the aggravated kidnapping charge?*

Koch next argues that the district court erred when it refused to give a jury instruction on the aggravated kidnapping charge with language from *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976), explaining the definition of confinement. The State maintains that the requested instruction was not legally appropriate.

15

In reviewing claims of instructional error, an appellate court first considers whether there is appellate jurisdiction and if the issue was preserved for review. Next, this court reviews whether the requested instruction was legally and factually appropriate. Finally, if there was an error, this court will determine whether it requires reversal of the conviction. *State v. Ervin*, 320 Kan. 287, 293-94, 566 P.3d 481 (2025).

At trial, Koch's counsel requested an instruction telling the jury that to prove the aggravated kidnapping charge the State was required to establish the alleged confinement (1) "[m]ust not be slight, inconsequential and merely incidental to any intended injury," (2) "[m]ust not be of the kind inherent in or the cause of the intended injury," and (3) "[m]ust have some significan[ce] independen[t] of the intended injury that makes the intended injury substantially easier of commission or substantially lessens the risk of detection." This language is taken directly from *Buggs*, 219 Kan. at 216.

In making this request, Koch acknowledged that *State v. Burden*, 275 Kan. 934, 943, 69 P.3d 1120 (2003), explicitly limited the application of this *Buggs* test to kidnappings that were alleged to have occurred with the intent to facilitate the commission of another crime. Koch was charged with committing a kidnapping with the intent to hold N.A. to inflict bodily injury on her. The district judge declined to give the requested instruction, explaining, "I can appreciate the concerns and criticisms you have of the way the law stands now, . . . but I am still bound to follow the precedent and so I am not going to give that instruction that you proposed."

Jury instructions are legally appropriate when they fairly and accurately state the applicable law. This court's review is unlimited in deciding whether the complained-of instruction is legally appropriate. *State v. Moore*, 319 Kan. 557, 565-66, 556 P.3d 466 (2024). Koch argues that his "requested instruction is legally appropriate for every variety of kidnapping so long as the evidence supports it." That said, he seems to also concede

16

that the Kanas Supreme Court has explained that the focus of the *Buggs* test, which his requested instruction was drawn from, is only applicable to cases in which the State alleges that the victim was confined with the intent to facilitate the commission of another crime—a situation inapplicable to the kidnapping charge he faced.

In both *Burden* and more recently in *State v. Butler*, 317 Kan. 605, 533 P.3d 1022 (2023), the Kansas Supreme Court has explicitly held that the *Buggs* test is not applicable to kidnappings where the taking or confinement is alleged to have occurred with the intent to inflict bodily injury or to terrorize:

> "The three-part test set out in *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976), applies only when the defendant is convicted of taking or confining a person with the intent to facilitate the commission of another crime under K.S.A. 2022 Supp. 21-5408(a)(2). The test does not apply when the defendant is convicted of taking or confining a person with the intent to inflict bodily injury or to terrorize the victim or another under K.S.A. 2022 Supp. 21-5408(a)(3)." *Butler*, 317 Kan. 605, Syl. ¶ 2.

This court is duty-bound to follow Kansas Supreme Court precedent unless there is some indication that the court is departing from or modifying the rule established. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). Koch fails to show that the Kansas Supreme Court is departing from its position. Because Koch's proposed instruction was not legally appropriate, the district court did not err in refusing to give it to the jury.

*Did the district court err by not giving an attempted aggravated kidnapping instruction?*

Koch next argues that the district court erred when it declined his request for an instruction on attempted aggravated kidnapping as a lesser included offense to the aggravated kidnapping charge. The State responds that an instruction for attempted

17

aggravated kidnapping was not factually appropriate under the circumstances. The State also argues that any error in failing to give the instruction was harmless.

We set forth our three-step process for reviewing claims of instructional error in the last section of this opinion. *Ervin*, 320 Kan. at 293-94. Because Koch requested that the jury be instructed on attempted aggravated kidnapping as a lesser included offense to the charged aggravated kidnapping, the issue is preserved for appeal. Jury instructions on lesser included offenses are generally legally appropriate. *State v. Gentry*, 310 Kan. 715, 721, 449 P.3d 429 (2019). And a lesser included offense includes an attempt of the same crime. K.S.A. 21-5109(b)(3).

As the requested instruction was legally appropriate, this court must consider whether it was factually appropriate. "A legally appropriate lesser included offense instruction must be given when there is some evidence, viewed in a light most favorable to the defendant, emanating from whatever source and proffered by whichever party, that would reasonably justify the defendant's conviction for that lesser included crime." *State v. Berkstresser*, 316 Kan. 597, 601, 520 P.3d 718 (2022); see also K.S.A. 22-3414(3) ("In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to the crime charged and any such lesser included crime."). The question of factual appropriateness is not focused on whether the evidence is more likely to support a conviction for the greater offense, but whether the court would uphold a conviction for the lesser offense in the face of a challenge to the sufficiency of the evidence. See 316 Kan. at 601.

In deciding not to give the requested instruction, the district judge concluded there was not sufficient evidence, stating, "I don't think there's evidence to support that this was an attempt at a kidnapping that was a failed attempt. . . . I think the evidence is either it

was a completed kidnapping or it wasn't a kidnapping at all." The record supports this conclusion.

Koch contends that he fell short of completing the crime of kidnapping because he was never able to successfully confine N.A. His argument relies on the chaotic nature of his attack on N.A., highlighting his inability to assert control over her after he corralled her in her bedroom. In other words, he argues that in determining whether an aggravated kidnapping occurred, some consideration should be given to the fact that he did not do a very good job of taking and confining N.A.

This type of argument has repeatedly been rejected by Kansas courts. See *State v. Pham*, 281 Kan. 1227, 1264, 136 P.3d 919 (2006) (concluding defendant was not entitled to an instruction on attempted aggravated kidnapping because the crime of kidnapping was completed before the defendant fled the scene, regardless of the victims managing to free themselves); *State v. Jackson*, 238 Kan. 793, 800, 714 P.2d 1368 (1986) (finding defendant was not entitled to instruction on attempted aggravated kidnapping because he lacked sufficient control over the victim because the evidence showed the victim was under his control); *State v. Little*, 26 Kan. App. 2d 713, 718, 994 P.2d 645 (1999) (finding defendant was not entitled to a lesser included offense instruction to aggravated kidnapping and kidnapping because the defendant poorly bound the hands of a victim who was able to quickly escape). These cases all suggest that a victim's ability to escape or the defendant's lack of total control does not necessarily mean that the act of kidnapping did not occur. Here, while Koch was perhaps not successful in getting N.A. completely inside the closet and was injured during the struggle to overpower his victim, it is clear N.A. was under his control during the duration of the incident.

"An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or

19

intercepted in executing such crime." K.S.A. 21-5301(a). So, to be convicted of attempted aggravated kidnapping, Koch would have had to perform one or more overt acts toward the commission of aggravated kidnapping, with the intent to commit an aggravated kidnapping, but failed to complete the crime of aggravated kidnapping. The evidence did not support such a finding. An aggravated kidnapping is completed under Kansas law when the defendant has taken or confined a person by force, threat, or deception with the requisite intent outlined in K.S.A. 21-5408(a), and bodily harm has been inflicted upon the victim, as required by K.S.A. 21-5408(b). As the district court found, the evidence showed either a completed kidnapping or no kidnapping at all.

Koch points to several pieces of evidence to show that he lacked control over N.A. during the attack. Though this evidence is mainly in the form of his own testimony, a defendant's unsupported testimony alone can be sufficient to require a lesser included instruction. *State v. Childers*, 217 Kan. 410, 415, 536 P.2d 1349 (1975). But Koch's testimony was that he never intended to confine N.A. in the bedroom or closet, that the entire struggle was brief, and that he never had control over her because she was so successful at fighting back. When viewed in a light more favorable to Koch, this evidence would support a conclusion that he did not commit an aggravated kidnapping at all, not that he committed an attempted aggravated kidnapping. Because an instruction on attempted aggravated kidnapping was not factually appropriate under the circumstances, the district court did not err by declining to give the instruction to the jury. We need not address the State's claim that any error in failing to give the instruction was harmless.

*Did the district court err by not giving a unanimity instruction?*

Koch next argues the district court erred by declining his request to give the jury a unanimity instruction as to the overt acts for committing attempted second-degree murder and as to the alternative means of committing aggravated burglary. Koch contends this error violates his rights under the Sixth Amendment to the United States Constitution and

20

section 10 of the Kansas Constitution Bill of Rights. The State contends that a unanimity instruction was not legally or factually appropriate because the attempted murder and aggravated burglary charges were not based on multiple acts.

When a case involves multiple acts, the jury must unanimously agree on which specific act constitutes the crime. K.S.A. 22-3421; *State v. King*, 297 Kan. 955, 977, 305 P.3d 641 (2013). To ensure a unanimous verdict in such cases, the district court must give the jury a unanimity instruction or the State must elect the particular act it relies on for the conviction. 297 Kan. at 978.

As stated above, an appellate court generally reviews jury instruction errors by asking whether the party preserved the issue, whether the jury instruction is legally and factually appropriate, and whether any error requires reversal. See *Ervin*, 320 Kan. at 293-94. But this court uses "a more particularized test when, as here, a defendant challenges a district court's failure to give a unanimity instruction in a case potentially involving multiple acts." *State v. Garcia-Martinez*, 318 Kan. 681, 693-94, 546 P.3d 750 (2024). First, this court will determine whether the case involves multiple acts. If it does, this panel will consider whether an error occurred because the district court failed to give a unanimity instruction and the State failed to elect which act it was relying on. Third, if there was an error, it must be determined whether it requires reversal. *Harris*, 310 Kan. at 1039.

Under the first step, this court must decide "'whether the defendant's actions could have given rise to multiple counts of the charged crime or whether the alleged conduct was unitary.'" 310 Kan. at 1039. Our Supreme Court has explained that "'acts are multiple acts if they are factually separate and distinct.'" *State v. Moyer*, 306 Kan. 342, 360, 410 P.3d 71 (2017). Incidents are factually separate when either independent criminal acts have occurred at different times or when a fresh impulse motivated a later criminal act.

21

306 Kan. at 360. Appellate courts look to several factors to determine whether conduct was unitary: (1) whether the acts occurred at or near the same time; (2) whether they occurred at the same location; (3) whether an intervening event occurred between the acts; and (4) whether a fresh impulse motivated any portion of the acts. *Harris*, 310 Kan. at 1039. When the alleged conduct is unitary, no unanimity instruction is necessary and the analysis ends. See *State v. Voyles*, 284 Kan. 239, 244, 160 P.3d 794 (2007).

As to the attempted murder charge, Koch contends that a unanimity instruction was required because the State allegedly relied on multiple acts that could have given rise to multiple charges. He asserts that the alleged choking with the electrical cord and bashing with the glass jug were two distinct acts both of which could have supported the charge. The evidence the State presented does not support Koch's argument.

To begin, both the choking with the cord and hitting with the jug occurred at or near the same time—both N.A. and Koch described their struggle as being a continuous event from the moment it began until Koch fled the house. N.A. testified that the attack lasted about 15 minutes, while Koch recalled that it lasted mere minutes. So the evidence shows the acts occurred at or near the same time. The acts also both occurred in the same location, N.A.'s bedroom. Nor was there any intervening event between the attempted strangulation and the hitting with the glass jug. Finally, it does not appear that Koch's actions were motivated by any fresh impulse. The State is correct that the evidence showed one continuous attack that could not be broken into two different attempted murders. Because the alleged conduct was unitary, the district court did not need to provide a unanimity instruction on the attempted murder charge.

Turning to Koch's assertion that he was entitled to a unanimity instruction on the predicate felony for the aggravated burglary charge, the State maintains that it presented

22

an alternative means case, not a multiple acts case, so a unanimity instruction was unnecessary. The State is correct.

> "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. *Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means.* In reviewing an alternative means case, a court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt. In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, courts require that either the State elect the particular criminal act upon which it will rely for conviction or that the district court instruct the jury that all jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt." (Emphasis added.) *State v. Dixon*, 289 Kan. 46, Syl. ¶ 7, 209 P.3d 675 (2009).

Here, the jury was instructed on two crimes Koch could have intended to commit upon remaining within the house: (1) attempted second-degree murder and (2) aggravated battery. These two predicate felonies were alternative means of committing aggravated burglary. And the State presented substantial evidence to support both of those means—the jury convicted Koch of each of the underlying felonies, which would tend to support a finding that sufficient evidence supported each of the alternative means. As a result, the district court did not err in failing to give a unanimity instruction.

*Did the district court err in instructing the jury on aggravated burglary?*

Koch contends the district court's instruction for aggravated burglary included a legally inappropriate alternative means of conviction. He challenges the inclusion of *attempted* second-degree murder as one of two felonies he intended to commit inside N.A.'s house because a criminal defendant may not act with the intent to commit an

23

attempted crime. Koch asserts the error "is automatically reversible." The State concedes that the jury instruction was legally erroneous but maintains the error was harmless because it included a legally appropriate alternative means of conviction.

The district court instructed the jury to establish the charge of aggravated burglary, the State needed to prove that Koch remained in a dwelling, without authority, "with the intent to commit a felony, attempted murder in the 2nd degree and/or aggravated battery." The State concedes the instruction was erroneous to the extent that it included attempted murder as one of the predicate felonies because a defendant cannot intend to commit an attempted crime. We have set forth our three-step process for reviewing claims of instructional error previously in this opinion. *Ervin*, 320 Kan. at 293-94.

To begin, this court must determine whether Koch preserved the issue. The State maintains that Koch has not preserved his current challenge because although he objected to the aggravated burglary instruction, he did so on different grounds than he raises on appeal. When the basis of a defendant's objection to a jury instruction at trial differs from the basis for the issue raised on appeal, an appellate court reviews the instruction for clear error. See, e.g., *State v. Hillard*, 313 Kan. 830, 845, 491 P.3d 1223 (2021). Koch argues that the issue is preserved because he "objected to the aggravated burglary instruction, requesting the prosecution elect a target felony or a unanimity instruction be given."

During the instructions conference, Koch objected to the aggravated burglary instruction but not because it is impossible to intend to commit an attempted crime. Rather, Koch argued that the State should either pick one of the two intended felonies or the district court should give a unanimity instruction. Because Koch's argument on appeal differs from the objection he raised at trial, we typically would apply the clear error standard. See K.S.A. 22-3414(3). For a jury instruction to be clearly erroneous "the court must be firmly convinced the jury would have reached a different verdict if the erroneous

24

instruction had not been given. The party claiming clear error has the burden to show both error and prejudice." *State v. Mendez*, 319 Kan. 718, 727-28, 559 P.3d 792 (2024).

But Koch argues under *Griffin v. United States*, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991) (citing *Yates v. United States*, 354 U.S. 298, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 [1957], *overruled on other grounds Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 [1978], and *Stromberg v. People of State of California*, 283 U.S. 359, 51 S. Ct. 532, 75 L. Ed. 1117 [1931]), that the error is automatically reversible because the jury was given a means of conviction that was legally impossible.

In *Griffin*, the defendant was charged with fraud under two distinct theories, but the evidence was only sufficient to prove one of those theories. Ultimately, the defendant was convicted with a general verdict that did not specify the theory on which the jury relied. 502 U.S. at 47-48. The *Griffin* Court distinguished cases in which convictions were based on legally insufficient grounds, i.e., unconstitutional provisions of a statute or legally insufficient proof, from convictions based on insufficient factual proof to support one of several bases for the convictions. 502 U.S. at 51-60. For the former, based on legal inadequacy, the Court explained that the conviction must be reversed because jurors are not equipped to discern such legal inadequacies. But for the latter, involving insufficient evidence, the conviction could stand because jurors, by their very nature, are equipped to assess and weigh the evidence. The *Griffin* Court concluded there is a commonsense reason to distinguish between a jury instruction which misstates the law and one which presents a theory of conviction not supported by the evidence. 502 U.S. at 59.

The State counters that this court should instead follow the reversibility inquiry conducted by the Kansas Supreme Court in *State v. Carr*, 300 Kan. 1, 162-66, 331 P.3d 544 (2014), *rev'd and remanded on other grounds Kansas v. Carr*, 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016), which addressed the holdings in *Griffin*, *Yates*, and

*Stromberg*. In *Carr*, the Kansas Supreme Court dealt with instructional error for four capital murder convictions, which it concluded were legally inappropriate under Kansas law and legally inadequate under federal law in *Stromberg* and *Yates*. *Carr*, 300 Kan. at 162-63. The *Carr* court explained that rather than apply the clear error standard, it would proceed to determine "whether the other theory available to the jury was legally adequate." 300 Kan. at 163-64 (noting that the decisions in *Stromberg* and *Yates* predated the United States Supreme Court's recognition in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 176 L. Ed. 2d 705 [1967], of the harmlessness of nonstructural constitutional error). For three of the convictions, there was no legally adequate ground presented, so the convictions had to be reversed. But for the fourth conviction, the *Carr* court examined whether any of the convictions could be deemed harmless under the *Chapman* standard—that is, looking to "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Carr*, 300 Kan. at 164.

Here, as in *Carr*, the verdict was unanimous on the legally appropriate means of committing aggravated burglary. Because the jury found Koch guilty of both attempted second-degree murder and aggravated battery—both of the intended felonies included in the aggravated burglary instruction—it is certain the jury would have found Koch guilty of the aggravated burglary charge had the only predicate felony been aggravated battery. There is no reasonable possibility that the error in including attempted second-degree murder as the intended crime impacted the jury's verdict. Although the district court gave a legally inappropriate instruction on the aggravated burglary charge, we conclude beyond a reasonable doubt that the error did not contribute to the verdict.

*Did the State commit reversible prosecutorial error during closing argument?*

Koch asserts the State committed reversible error during closing argument by allegedly misstating the evidence when the prosecutor claimed that Koch closed the door

26

of N.A.'s room during the attack. The State maintains that the prosecutor's comment was an inference reasonably drawn from the evidence, and even if the comments lacked an evidentiary foundation, the error was harmless.

In considering a claim of prosecutorial error, an appellate court first assesses whether the prosecutor committed error by deciding whether the "'acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.'" *State v. J.L.J.*, 318 Kan. 720, 725, 547 P.3d 501 (2024). Generally speaking, a "prosecutor has wide latitude in crafting arguments and drawing 'reasonable inferences from the evidence but may not comment on facts outside the evidence.'" [Citations omitted.]" *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015). But a prosecutor arguing facts or an inference with no evidentiary foundation is prosecutorial error. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021).

If this court concludes the prosecutor stepped outside this wide latitude, it must then consider whether that error prejudiced the defendant's right to a fair trial. *J.L.J.*, 318 Kan. at 725. In evaluating prejudice, prosecutorial error is harmless only if the State can show beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

During his closing argument, while discussing the element of confinement for the aggravated kidnapping charge, the prosecutor stated that Koch closed the bedroom door. The prosecutor asserted, "You know what else? He shut that door." He then continued by claiming that the evidence supported that Koch had shut the bedroom door to keep N.A.'s dog away during the attack. Koch's counsel did not object to either of these statements. On appeal, Koch argues no evidence supported the prosecutor's assertion that he shut the

door. The State maintains that the comment was a reasonable inference and well within the latitude afforded the prosecutor in crafting his closing argument.

N.A. repeatedly testified that the bedroom door was open when Koch pushed her back into her bedroom, and that, sometime during the struggle, the door was shut, but she did not know how. For his part, Koch testified that he could not recall when the bedroom door was closed, but he acknowledged it was closed when he tried to leave the bedroom. Koch denied shutting the bedroom door during the attack.

Although there was no direct testimony that Koch closed the door, the prosecutor's comment was based on a reasonable inference drawn from the evidence. Only two people were in the house that evening, Koch and N.A. Both agreed that sometime during the attack, the door was closed. Because the door did not close itself and N.A. did not remember shutting the door, it was reasonable for the prosecutor to infer and argue Koch, the only other person in the residence, shut the door to maintain confinement over N.A.

But even if the prosecutor misstated the evidence by saying with certainty that Koch closed the bedroom door during the encounter, we conclude beyond a reasonable doubt that the error was harmless and did not prejudice Koch's right to a fair trial. The confinement element of the aggravated kidnapping charge was not solely because the bedroom door was closed. N.A. testified in great detail how Koch physically constrained her from moving and escaping him. N.A. testified that Koch punched her in the face as he tried to shut her in the closet. And as she tried to get away and grab her phone, Koch got on top of her and continued to beat her with his fists and the glass jug. There is no reasonable possibility that any isolated statement by the prosecutor about how the bedroom door was closed contributed to the verdict and denied Koch a fair trial.

*Did the district court err by refusing to declare a mistrial?*

Koch argues that the district court abused its discretion by not granting his motion for a mistrial based on two prejudicial comments made by an investigating detective about (1) his assignment to the repeat offender unit and (2) Koch's uncharged thefts during his flight to Missouri. The State argues the district court's denial of Koch's motion for a mistrial was not an abuse of discretion and that the district court took adequate remedial measures to address the alleged errors.

Appellate courts review a district court's grant or denial of a mistrial under K.S.A. 22-3423 for an abuse of discretion. *State v. Barlett*, 308 Kan. 78, 88, 418 P.3d 1253 (2018). Judicial discretion is abused if judicial action is (1) unreasonable, i.e., if no reasonable person would take the view adopted by the district court; (2) based on an error of law; or (3) based on an error of fact. *State v. Ward*, 292 Kan. 541, 570, 256 P.3d 801 (2011). The party asserting the district court abused its discretion has the burden of showing it. *State v. Peters*, 319 Kan. 492, 497-98, 555 P.3d 1134 (2024).

K.S.A. 22-3423(1)(c) provides that a district court may "terminate the trial and order a mistrial at any time" that it finds that "termination is necessary because: . . . prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." As he argued when requesting a mistrial from the district court, Koch contends that two comments made by a testifying detective prejudiced him and deprived him of a fair trial.

When ruling on a motion for mistrial under K.S.A. 22-3423, a district court uses a two-step process. First, the court determines whether the prejudicial conduct caused a fundamental failure in the proceeding. If so, the court then decides whether "the prejudicial conduct made it impossible to continue the proceeding without denying the parties a fair trial." *State v. Fraire*, 312 Kan. 786, 790, 481 P.3d 129 (2021). Under the

29

second step, the court considers whether the conduct caused prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice. *State v. Moore*, 302 Kan. 685, 693, 357 P.3d 275 (2015).

At trial, when Detective Jonathan Shepard was asked about his role within the Riley County Police Department, he replied, "I was initially assigned with Patrol, and as of April of this year, I've been with the Investigations side for the ROU unit." He then clarified that ROU stood for the "repeat offender unit." Koch's counsel objected and requested a mistrial outside the jury's presence, arguing Shepard's comment about his unit assignment implied to the jury that Koch was a repeat offender. Rather than declaring a mistrial, the district court found the issue could be cured by asking the State to clarify that Shepard was working in a patrol unit, not the repeat offender unit, during his involvement in Koch's case. The State proceeded with its questioning of Shepard, who clarified that he was assigned as a patrol officer on the evening of Koch's break-in.

Soon after Shepard resumed his testimony, Koch's counsel moved for another mistrial when Shepard testified that he received a call from Koch's brother, who told Shepard that Koch "had stolen a vehicle from a friend as well as drugs." Koch's counsel argued that Shepard's comment was in violation of a motion in limine and K.S.A. 60-455. The State conceded that Shepard's comment was improper, but the prosecutor noted that Koch's alleged theft had originally been charged (although later dismissed for an absent witness) and that the error did not warrant a mistrial. The district court took the matter under advisement and allowed examination to continue.

Ultimately, the district court decided not to grant Koch's request for a mistrial, reasoning that Koch had admitted to both his drug use and having committed burglaries and thefts to feed his drug habit during his opening statement. The court found that Koch was not prejudiced by Shepard's comment because he had already admitted to similar

30

crimes as part of his defense. Koch's counsel requested that at the very least the district court should give a limiting instruction to the jury to indicate it should not consider the improper evidence, and the State agreed. The district court admonished the jury to disregard Shepard's testimony about any unrelated thefts, explaining that it should always disregard testimony subject to a sustained objection.

On appeal, Koch argues that the district court abused its discretion because its "decision was unreasonable, and no other judge would make it." He does not argue that the district court's decision to address Shepard's prejudicial statements via remedial actions rather than declaring a mistrial was an error of fact or law. The question before this court is whether it was unreasonable for the district court to find that the prejudicial statements could be cured through jury admonition and instruction.

As to the first comment, the error was quickly remedied by Shepard clarifying that he was not part of the repeat offender unit during his investigation of Koch. The impact of this comment was further lessened by the fact that Koch, as part of his defense, admitted committing thefts to support his drug habit. Turning to Shepard's comment that Koch had stolen a car and drugs from a friend after his attack on N.A., again Koch had already admitted committing thefts to support his drug habit. And the district court mitigated any prejudice by instructing the jury to disregard that testimony.

The district court took appropriate remedial measures to address both of the prejudicial comments made by Shepard during the trial and it properly found that granting a mistrial was an excessive remedy. Based on a review of the entire record, Shepard's comments were not significantly prejudicial to have affected the trial's outcome. And any prejudice that did occur was mitigated by the district court's admonition to the jury. Koch has failed to show that the district court abused its discretion by denying Koch's motion for a mistrial.

31

*Did cumulative error deprive Koch of his right to a fair trial?*

Koch argues that his convictions must be reversed under the cumulative error doctrine. The State argues that Koch is not entitled to relief. When the totality of the circumstances shows that individually harmless errors, when considered together, substantially prejudiced the defendant's right to a fair trial, this court will reverse a defendant's convictions. *State v. Showalter*, 318 Kan. 338, 364, 543 P.3d 508 (2024).

The only error Koch has established is the legally inappropriate instruction on aggravated burglary. We also found that any prosecutorial error during closing argument was harmless. But even if these two errors are considered collectively, under the totality of the circumstances presented here, we have no difficulty concluding that the errors did not prejudice Koch's right to a fair trial.

*Is Koch's sentence illegal?*

Koch next argues that his sentence is illegal because the State failed to prove that his 2016 conviction for municipal misdemeanor battery, which was aggregated to form a person felony, was correctly included in his criminal history score. The State responds that the municipal conviction was properly included in Koch's criminal history score.

When a defendant argues that there is an error in the calculation of their criminal history score, this court is presented with a question of law over which it exercises unlimited review. *State v. Dawson*, 310 Kan. 112, 116, 444 P.3d 914 (2019). Similarly, when the question under review involves the proper classification of a prior conviction, the appellate court is tasked with analyzing a legal question and again exercises unlimited review in resolving the matter. *State v. Dickey*, 305 Kan. 217, 220, 380 P.3d 230 (2016).

Before the sentencing hearing, Koch filed a pro se objection to his criminal history score, in which he argued that he was not represented by counsel for his 2016 conviction for misdemeanor battery in Manhattan Municipal Court and that the offense was not comparable to the state version of the offense. Because Koch raised this objection, the State was obligated to prove Koch's conviction. K.S.A. 21-6814(c) ("The state shall have the burden of proving the disputed portion of the offender's criminal history.").

At the sentencing hearing, in which Koch appeared pro se, the State presented a journal entry of the 2016 municipal conviction; but that journal entry is not found in the record on appeal. Upon reviewing the document, the district court stated, "This Court will find that this journal entry is proof that Mr. Koch was convicted of battery in municipal court, which is the 23rd entry on the criminal history in the Presentence Investigation, Manhattan Municipal Court Case No. CR1600281."

Koch then stated that he wanted to "raise another issue with item 23." He asserted that the journal entry indicated the wrong municipal provision—he claimed that he was convicted under an earlier version of the ordinance. The district court asked Koch if he had any indication the ordinances were different. Koch responded that "the mental culpability is different. The . . . [current version] has a knowingly culpability. I believe the [prior] Manhattan Municipal [ordinance] is intentional." The district court pointed out that "intentional is a higher culpable state than knowingly, so if you were convicted of battery under an intentional culpable mental state then you were convicted under a knowingly."

On appeal, Koch contends the State failed to meet its burden to show that his 2016 municipal conviction was comparable to a state offense and thus his sentence is illegal. Koch does not claim on appeal, as he did in district court, that he was not represented by

counsel in his 2016 municipal court case. An issue not briefed is considered waived or abandoned. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021).

Our review of this issue is hampered by the fact that the journal entry of Koch's 2016 municipal conviction that the State presented at the sentencing hearing is not included in the record. The party alleging an error occurred has the burden of designating a record that establishes the claimed error. *State v. Liles*, 313 Kan. 772, 783, 490 P.3d 1206 (2021); see also Supreme Court Rule 6.02(a)(4), (a)(5) (2025 Kan. S. Ct. R. at 36) (appellant has the burden to furnish a sufficient record to support the claims of error; appellant's claims of error must be supported with specific citations to record on appeal). Without such a record, an appellate court presumes the district court's actions were proper. *State v. Valladarez*, 288 Kan. 671, 686, 206 P.3d 879 (2009).

Under Kansas law, violations of municipal ordinances are included in a defendant's criminal history score if they are "comparable to any crime classified under the state law of Kansas as a person misdemeanor, select nonperson class B misdemeanor or nonperson class A misdemeanor." K.S.A. 21-6810(a). Additionally, K.S.A. 21-6810(d)(6) provides: "*All person misdemeanors*, class A nonperson misdemeanors and class B select nonperson misdemeanors, *and all municipal ordinance and county resolution violations comparable to such misdemeanors, shall be considered and scored*." (Emphases added.) Relevant here, three comparable municipal violations may be aggregated into one adult conviction or juvenile adjudication of a person felony for criminal history purposes. K.S.A. 21-6811(a). And the Kansas Supreme Court has explicitly held that "violations of municipal ordinances are to be treated as comparable misdemeanors for purposes of calculating criminal history, including aggregation." *State v. Vega-Fuentes*, 264 Kan. 10, 16, 955 P.2d 1235 (1998).

To determine whether an offense is comparable, our Supreme Court has used a test similar to that set forth in *State v. Wetrich*, 307 Kan. 552, 412 P.3d 984 (2018). See *State v. Russ*, 309 Kan. 1240, 443 P.3d 1060 (2019). Under that test, to be a comparable offense, the elements of the municipal crime cannot be broader than the elements of the state version of the crime—that is, the municipal crime must be identical to, or narrower than, the elements of the state crime to which it is being compared. 309 Kan. at 1243.

While the district court did not take judicial notice of the ordinance under which Koch was convicted and instead relied on Koch's representation about what the provision provided, this court may take judicial notice of the ordinance. See K.S.A. 60-412(c). The 2016 version of the offense Koch was convicted under, Manhattan Municipal Code Section 22-17 (2016), provided:  "Battery is: (1) Intentionally or recklessly causing bodily harm to another person; or (2) Intentionally causing physical contact with another person when done in a rude, insulting or angry manner." The Kansas offense, provided under K.S.A. 21-5413, is identical except that it requires the mens rea of "[k]nowingly or recklessly." "Intentionally" is a higher culpable mental state than "knowingly" or "recklessly." See K.S.A. 21-5202(b). As the district court pointed out to Koch at the sentencing hearing, "[p]roof of a higher degree of culpability than that charged constitutes proof of the culpability charged." K.S.A. 21-5202(c).

Thus, the municipal offense was comparable; its elements are not broader than the elements of the state version of the crime. In fact, the municipal conviction required an elevated mental state that Koch acted intentionally, rather than merely knowingly. Accordingly, the district court did not err in including the municipal conviction in Koch's criminal history score. Koch is not serving an illegal sentence.

35

*Did the State commit prosecutorial misconduct by presenting perjured testimony?*

In his pro se brief, Koch argues the State knowingly presented perjured testimony from Shailer about N.A. having her cellphone when she was at the hospital following the attack. The State argues this issue is not preserved for this court's review because although Koch included his argument in a motion for a new trial, he did not lodge a contemporaneous objection to the allegedly perjured testimony at trial. The State also asserts that the prosecutor did not knowingly present perjured testimony to the jury.

Koch concedes that he did not object to the instances of prosecutorial misconduct of which he now complains. That said, he included his argument about evidence related to N.A.'s phone as part of his pro se motion for new trial. He asserts that appellate review of his argument is not contingent on a contemporaneous objection because the claim is one of prosecutorial misconduct, relying on *State v. Hall*, 292 Kan. 841, 846, 257 P.3d 272 (2011). Koch's reliance on *Hall* is misplaced because he is not alleging an instance of prosecutorial misconduct related to statements made during voir dire, opening statements, or closing statements—his claim related to the presentation of testimony at trial.

Under K.S.A. 60-404: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." In *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009), the Kansas Supreme Court held: "[I]n accordance with the plain language of K.S.A. 60-404, evidentiary claims—including questions posed by a prosecutor *and responses to those questions during trial*—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal." (Emphasis added.) Essentially, *King* and subsequent cases following its rationale explain that a defendant cannot repackage what is ostensibly an evidentiary issue into a claim of

36

prosecutorial error in order to get around the contemporaneous objection rule. See *State v. George*, 311 Kan. 693, 701-04, 466 P.3d 469 (2020).

Koch's prosecutorial misconduct claim is based on an evidentiary issue—Shailer's testimony about who possessed N.A.'s phone when she was in the hospital—that Koch did not contemporaneously object to at trial. Under the rule established in *King*, and in the absence of a contemporaneous objection under K.S.A. 60-404, the issue is not preserved for appellate review. See *King*, 288 Kan. 333, Syl. ¶¶ 5-6.

*Did the State fail to disclose exculpatory evidence?*

Finally, Koch asserts that the State failed to disclose exculpatory impeachment evidence—a report created by Compagnone and details of any agreements between the State and one of its witnesses, Jessica Haman, who testified about Koch trading stolen items for meth. Koch contends the State violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and, thus, his due process rights under the United States Constitution were violated. Koch asserted these claims in district court in his pro se motion for new trial. The State argues the district court did not abuse its discretion in denying Koch's motion for a new trial on *Brady* grounds because Koch failed to show that it committed any discovery violation.

A district court may grant a new trial to a defendant "if required in the interest of justice." K.S.A. 22-3501(1). Appellate courts review a ruling on a motion for mistrial for an abuse of discretion, but the district court's ruling on the existence of a *Brady* issue is reviewed de novo. *State v. Hirsh*, 310 Kan. 321, 333, 446 P.3d 472 (2019).

The framework of the *Brady* analysis is well-established:

"7. . . . [P]rosecutors have a positive duty to disclose evidence favorable to the accused when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

"8. Because law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement.

"9. Evidence that is favorable to the accused encompasses both exculpatory and impeachment evidence. For *Brady* purposes, there is no distinction between these two types of evidence that are favorable to the accused; thus, impeachment evidence is considered exculpatory.

"10. There are three components or essential elements of a *Brady* violation claim: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.

"11. Under the test for materiality governing all categories of *Brady* violations, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Warrior*, 294 Kan. 484, Syl. ¶¶ 7-11, 277 P.3d 1111 (2012).

In his new trial motion, Koch argued the State committed a *Brady* violation by failing to turn over a report that Compagnone referenced during her testimony about her meeting with N.A. on October 15, 2019, four days after she was released from the hospital. At the hearing on Koch's motion, Compagnone testified and produced a "packet of papers"—her records of Koch's casefile—that included "a memorialization of the October 15th, 2019 meeting" she had with N.A. Essentially it was a written report or notes outlining her October 15, 2019 meeting with N.A. based on a recording of that interview. The recorded interview had been provided to the parties during discovery

38

before trial. Compagnone explained that the "packet of papers" had not been sent to the State and Koch in their current form before trial but consisted of the same reports she had provided but "just probably in a different format."

Turning to the elements of a *Brady* claim, the record shows that Koch is not entitled to relief. First, it is unclear how the narrative report Compagnone created and then referenced at trial would favor Koch. While Compagnone read from her notes at trial, she explained that they were derived from the October 15, 2019 interview, which Koch had access to before trial. Koch does not explain how this report could have served as impeachment evidence. Nor does it appear that the report was material—that is, there is no reasonable probability that the result of the trial would have been different had the report been disclosed. Compagnone testified that she had provided the contents of the report to the parties before trial in a different form. Koch introduced no evidence to support his claim that the report was exculpatory. He fails to show any *Brady* violation regarding Compagnone's narrative report.

Regarding his claims about the State allegedly giving a deal to Jessica Haman for her testimony, in his motion for a new trial, Koch argued the State had committed a *Brady* violation by not disclosing any favorable agreement it had made with Haman for her testimony as well as by not disclosing evidence of her criminal history. He argued that the withholding of this information had prevented him from properly impeaching Haman's testimony at trial. At trial, Haman stated that she was serving a sentence for drug-related offenses and had not reached a deal with the State in exchange for her testimony. At the hearing on Koch's motion, the State confirmed that despite Koch's allegations, it had never offered Haman any deal for her testimony.

Because Koch did not present any further evidence to support his allegation, the district court declined to grant him any relief. The district court noted that Koch had

admitted to engaging in criminal activity with Haman, thus negating any potential prejudicial impact. Koch offers no argument on appeal to convince us that the district court abused its discretion in denying the motion for new trial on this ground. Koch does not establish that the State committed a *Brady* violation regarding Haman's testimony.

Affirmed.